[No. S031285. June 29, 1995.]

MARY ANN WARFIELD, Plaintiff and Appellant, v.
PENINSULA GOLF & COUNTRY CLUB et al., Defendants and
Respondents.

COUNSEL

Belli, Belli, Brown, Monzione, Fabro & Zakaria, Melvin M. Belli, Kevin R. McLean, Shelley R. Antonio, Vincent M. O'Brien and Randall H. Scarlett for Plaintiff and Appellant.

Jon W. Davidson, Sharon Oxborough, Paul L. Hoffman and Carol A. Sobel as Amici Curiae on behalf of Plaintiff and Appellant.

Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Robert F. Kane, Paul D. Herbert and Stacey L. Pratt for Defendants and Respondents.

Severson & Werson and Jan T. Chilton as Amici Curiae on behalf of Defendants and Respondents.

OPINION

GEORGE, J.—In the case before us, we are called upon to determine whether California's "public accommodation" statute (Civ. Code § 51, also commonly known as the Unruh Civil Rights Act)[1] precludes private social clubs from engaging in prohibited discrimination in their membership policies, and, in particular, whether this statute bars defendant Peninsula Golf & Country Club (hereafter defendant or the club) from excluding women from proprietary membership.

Section 51 provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their *sex*, race, color, religion, ancestry, national origin, or disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services *in all business establishments of every kind whatsoever*." (Italics added.) The issue we must decide is whether the activities and operations of defendant club render it a "business establishment" for purposes of section 51, so as to prohibit the club from excluding women from the "advantages" and "privileges" of proprietary membership.

We emphasize at the outset that our resolution of the legal issue before us does not turn upon our personal views as to the wisdom or morality of the exclusionary membership policy challenged in this case. Instead, our task involves a question of statutory interpretation. The question before us is

---

[1]For convenience and to minimize repetition, we hereafter refer to this statute as either section 51 or the Unruh Civil Rights Act.

whether the trial court properly concluded, in light of the nature and activities of defendant club as established by the record, that the club does not constitute a "business establishment" within the meaning of section 51.

As we shall explain, although the language of section 51, its historical background, and the past decisions of this court interpreting the statutory provision establish that *a truly private social club* generally would *not* constitute a "business establishment" within the meaning of section 51, we conclude that the operations of the club here at issue bring it within the terms of the very broad language of the statute ("*all* business establishments *of every kind whatsoever*" (italics added)). As we shall see, although the record indicates that defendant's financial support comes primarily from dues and fees paid by its members, the club derives a significant amount of revenue, as well as indirect financial benefit, from the use of its facilities, and the purchase of goods and services on its premises, by persons who are *not* members of the club. Because such "business transactions" with nonmembers are conducted on a regular and repeated basis and constitute an integral part of the club's operations—supplementing the members' own financial contributions and reducing the dues and fees that members otherwise would be required to pay in order to maintain the club's facilities and operations —we conclude that the club falls within the very broad category of "business establishments" governed by the nondiscrimination mandate of section 51. Additionally, in light of the nature and specific purposes of defendant club, we reject its argument that application of section 51 to the membership policies of the club would violate its members' rights of association and privacy under the federal and California Constitutions.

I

The facts underlying this litigation are largely undisputed. Defendant is a nonprofit social and recreational club that is owned and operated by a portion of its membership. Its facilities include a golf course, a driving range, putting greens, tennis courts, a swimming pool, locker rooms, a clubhouse, a dining room, several bars, a ballroom, and golf and tennis "pro" shops. In 1981, the relevant time period for purposes of these proceedings, the club had a number of categories of membership, each carrying its own distinct set of privileges with regard to use of the club's facilities.[2] At that time, the club had 350 proprietary members and approximately 350 additional members holding other categories of membership. Because most

---

[2]At that time, the club's bylaws set forth 10 membership categories: (1) *Regular Family Membership* (the only proprietary membership—entitling member, spouse, and children under the age of 21 years to full use of the club's facilities); (2) *Associate Family Membership* (open to persons who are under 36 years of age and are children of regular family members, and entitling member to full use of facilities "except that golfing privileges may be subject to

categories of membership authorized use of the club's facilities by both the member and the member's spouse and children under age 21, the number of persons with relatively unrestricted access to the club's facilities was considerably greater than 700. The record, however, does not disclose the specific number of persons who had general access to the club's facilities under the existing memberships.

In 1981, the facilities of the club were, as a general rule, available for use only by club members, their spouses, and their children under the age of 21 years, as well as the invited guests of members. There were, however, a number of exceptions to this general policy.

First, the golf and tennis "pro" shops, which were housed in structures located on the club's premises and owned by the club, were open to the general public as well as club members. Although the golf and tennis professionals who operated the pro shops received a monthly retainer from the club, the professionals were considered independent contractors under their agreements with the club, and they owned and had full control over the pricing and sale of the merchandise carried by the pro shops. As noted, nonmembers as well as members were permitted to enter the club's premises

restrictions not applicable to Regular Family Members and their spouses and children [under age 21]"); (3) *Extended Family Membership* (open to unmarried children of regular family members who are members of the household of a regular family member and are under 26 years of age, and entitling member to full use of the club's facilities, except that golfing privileges may be subject to restrictions not applicable to regular family members and their spouses and children under age 21); (4) *Tennis Pending Regular Family Membership* (open to any nominee approved for regular family membership when no such membership is then available for sale, and entitling member to all rights of a tennis member and, in addition, entitling member and spouse to golfing privileges "upon payment of regular guest green fees"); (5) *Tennis Membership* (entitling member, spouse of member, and children under age 21 to full use of the club's facilities "except that they shall not have golfing privileges"); (6) *Associate Tennis Membership* (open to persons who are under 36 years of age and are children of regular family members, tennis members, or associate family widow members, and entitling member, spouse, and children under age 21 to all club privileges except golfing privileges); (7) *Extended Tennis Membership* (open to unmarried children of regular family members, tennis members, or associate widow members, who are members of their parent-member's household and are under 26 years of age, and entitling member to all club privileges except golfing privileges); (8) *Associate Widow Membership* (open to widows of regular family members, and entitling member and children under age 21 to the same privileges, including golfing privileges, accorded to spouse and children of regular family member); (9) *Non-Resident Membership* (open to former regular family members who have sold this category of membership and whose principal residence is more than 200 miles from the club, and entitling member, spouse, and children under age 21 to same use of facilities as a tennis member and additionally to golfing privileges upon payment of regular guest green fees); and (10) *Special Membership* (board of directors given authority to create "special memberships for such periods of time and under such conditions and regulations as the Board may deem proper," which memberships may be terminated at the board's discretion).

to purchase merchandise from the pro shops, and such patrons also were permitted to take paid lessons from the professionals and use the club's facilities during such lessons. Although the club did not receive a share of the profits earned by the golf and tennis professionals, the record indicates that the operations of the pro shops were not completely distinct from the club's operations. For example, the golf pro was responsible for collecting and remitting to the club the greens fees charged by the club, and the golf and tennis pros in scheduling lessons for nonmembers were expected "not to take any prime times or use the facilities in any way that would interfere with the members' use of the facilities."

Second, in addition to permitting nonmembers to use the facilities and services of the golf and tennis pro shops, the club also allowed the use of many of its facilities by nonmembers as hosts of, or participants in, "sponsored events," such as golf or tennis tournaments, wedding receptions, bar mitzvahs, fashion shows, and special luncheons and dinners. These sponsored events were held, on average, once a week. For a nonmember (typically the friend of a member, or a charitable or professional organization) to host such an event at the club, the event had to be sponsored by a member. The sponsoring club member assumed responsibility for the event, but charges incurred for the event often were billed directly to the nonmember hosting the event. The charges assessed by the club for sponsored events were based upon the facilities of the club that were to be used. For example, an extra charge would be assessed if the participants in a golf tournament at the club were allowed to use the club's tennis courts as well. Although the record does not reflect the specific amounts typically charged by the club for such sponsored events, it does indicate that, at sponsored or "outside" golf tournaments, the greens fee charged by the club for each participant was higher than that charged at other times. Participants at sponsored events also could purchase food and beverages from the snack bar and other dining facilities on the club's premises. A club employee testified that there was a "mark up" on all food and beverages sold at the club.

Third, in addition to the use of the club's facilities by nonmembers in connection with the pro shop operations and with "sponsored events," nonmember employees of the club generally were permitted to use the facilities on Mondays, when the club was closed to members; the record does not suggest, however, that club employees were required to pay for such use. Fourth and finally, the record discloses that the club also permitted the golf teams of several local high schools to use the golf course, free of charge, during limited, nonprime hours.

When members used the club facilities or the pro shops, they paid for goods and services provided by the club (such as food and beverages, or

merchandise or lessons from the golf and tennis professionals), either with cash or by signing chits (receipts listing the amount of the purchase, and signed by the member). The club then billed the member for the chits and remitted the appropriate sums to the golf and tennis pros. In addition to the purchase of goods and services by its members, the primary sources of income for the club were initiation fees and dues paid by members, and charges for goods and services incurred by invited guests and by participants in sponsored events.[3] Charges incurred by invited guests could be paid either by members or by the guests themselves. Guests, however, could not sign chits and could pay only with cash. A club employee estimated that the club's total receipts for 1981 were approximately $1.5 million.

A number of club members testified that, on occasion, they brought business associates (clients or employees) to the club as invited guests, either for meals or for recreational activities, and that their businesses sometimes paid for the expenses involved in such occasions. Several club members also testified that, through their membership in the club, they had met other members who thereafter had become their patients, clients, or customers. Virtually all of the members who testified at trial stated, however, that they joined the club for its social and recreational attributes, not for its potential value for business purposes, and emphasized that they generally viewed the club as a refuge from, rather than an adjunct to, the business world.

In 1981, the club employed between 80 and 110 employees, all under the supervision of a general manager. Committees composed of members oversaw various club activities and operations.

As already noted, the club had numerous categories or classes of membership and had a total membership of approximately 700, but the only

---

[3]The record does not indicate specifically what percentage of the club's revenue was derived from each of these sources. With respect to the income obtained from sponsored events, however, the club's business manager testified that such revenue "was important" to the club but that the club's auditors monitored this income to ensure compliance with guidelines of the Internal Revenue Service limiting the amount of "nonmember business" a nonprofit social club may conduct without losing its tax-exempt status. (The business manager did *not* suggest that the income received from nonmembers by the golf and tennis pros was considered as part of the club's "nonmember business.")

The applicable Internal Revenue Service guideline provides that, as an audit standard, that agency will not rely solely upon a social club's gross receipts from nonmembers to establish that the club is nonexempt, where the club's gross receipts from nonmembers do not exceed 5 percent of the club's total gross receipts. (Rev. Proc. 71-17, § 3.01, 1971-1 C.B. 683; see *Pittsburg Press Club* v. *United States* (3d Cir. 1980) 615 F.2d 600, 604, fn. 6.) The guideline also explains that, even if the revenue received by the club for nonmembers' use of club facilities is not sufficiently substantial to result in the club's loss of its exemption, the club still may be liable for "unrelated business income tax."

proprietary membership—i.e., membership carrying an inchoate ownership interest in the club[4]—was the "Regular Family Membership," which was limited to 350 members. Under the bylaws, this type of membership interest was the only one that possessed a redemption value, and the only one that, under limited circumstances, could be transferred through inheritance. Furthermore, under the bylaws, only the holders of a Regular Family Membership had the right to vote for the club's board of directors, serve as a director, or participate in the decision as to who should be granted memberships in the club when membership openings arose. Finally, the bylaws provided that Regular Family Members enjoyed the most extensive privileges, with regard to use of the club's facilities, of all the classes of membership; although other membership classes could be granted the right to full or partial use of club facilities, the bylaws explicitly qualified the privileges of these other categories by specifying that such privileges could be subjected to restrictions not applicable to Regular Family Members.

The selection process for granting all memberships in the club, including Regular Family Memberships, was as follows. The club did not advertise to, or solicit membership applications from, the general public, and a nonmember could apply for membership only if sponsored by an existing member. An application also had to be seconded by two other members. The membership proposal then was reviewed by the membership committee, which received from the prospective member a form or questionnaire providing references, prior club memberships, and other personal and financial information. The membership committee investigated the information, conducted a credit check, and interviewed the prospective member and family at the home and place of business of the prospective member. After this process was completed, the membership committee voted on the candidate; two negative votes disqualified a candidate from further consideration. Upon approval of that committee, the membership proposal was sent to the board of directors, which sought input on the proposed member from all of the other proprietary members of the club. If any objection was raised, the membership proposal was sent back to the committee for further investigation. If no objection was received, or if any complaint was found to lack merit, the membership proposal was submitted to the board of directors for final approval.

---

[4]Although a number of proprietary members who testified at trial stated that each proprietary member owned one three-hundred fiftieth of the club's assets and liabilities, the relevant provision of the club's bylaws, in describing the interest of "Regular Family Members," recited that "[n]o member shall have any ownership rights in any property, real and personal, belonging to the Corporation, except upon its dissolution," and further stated that "[o]n such dissolution, the property and assets of the Corporation shall be distributed in equal shares to the then existing Regular Family Members in good standing."

Prior to March 1970, both men and women were eligible to hold all classes of membership in the club. In that month, however, the bylaws of the club were amended to provide that Regular Family Memberships "shall be issued only in the name of adult male persons" and "shall not be approved for females or minors." The relevant section of the bylaws further provided that, upon termination of the marriage of a Regular Family Member by divorce or annulment, "the Husband shall continue to be the Regular Family Member, and all rights, privileges and obligations shall be his. In the event of an award of the Certificate of Regular Family Membership in final judicial action to the female spouse, and the male spouse does not forthwith thereafter purchase the female spouse's interest in the Regular Family Membership, such Membership may, by action of the Board, be terminated." At the time of the 1970 amendment, several women held proprietary memberships in the club, and those women were permitted to retain their proprietary memberships following the amendment. After the 1970 amendment, however, a woman could be admitted only to a membership classification other than the Regular Family Membership.

Plaintiff in the present proceeding, Mary Ann Warfield, an avid golfer whose father had been a golf professional, became interested in the club after participating in golf tournaments held there and playing as a guest of several members on a number of occasions. After her family moved to a house that was only a few minutes from the club, she suggested to her husband, Richard Warfield, that a membership would be "great for the family." In June 1970, Richard Warfield was proposed for a Regular Family Membership. The membership proposal proceeded through the customary procedure, and a Regular Family Membership was approved by the board of directors and issued in the name of Richard Warfield on July 23, 1970. The initiation fee of $7,200 and monthly dues (which varied but, in 1981, apparently were in the range of $135) were paid by the Warfields with community funds, and plaintiff and her children thereafter regularly used the club facilities as family members without restriction.

As her children grew up, plaintiff's participation in club activities increased. She was an active member of the "ladies golf team" that represented the club in league competition with other country clubs, and, in several years, plaintiff won the championship in the club's annual ladies golf tournament. She had many close friends at the club, and she and her children spent much time there.

In 1976 or 1977, plaintiff obtained a real estate license and secured her first job as a real estate agent through a friend at the club. Thereafter, the

club proved to be an important source of contacts for plaintiff in pursuing her residential real estate business. She testified that she often discussed real estate transactions at the club with clients, associates, and other real estate agents, and never was discouraged from conducting such activities at the club. Plaintiff's husband, a dentist, also obtained patients as a result of his association with other members of the club.

In 1981, the marriage of plaintiff and her husband was dissolved. In the interlocutory judgment of dissolution, plaintiff was awarded "all right, title and interest in and to the membership of Dr. and Mrs. Warfield in the Peninsula Golf and Country Club." Thereafter, plaintiff requested that the board of directors transfer to her the Regular Family Membership previously held by her husband. After consulting legal counsel, the board voted in April 1981 to terminate the Regular Family Membership pursuant to the relevant provisions of the bylaws, and tendered to plaintiff a check in the amount of $6,129.15, representing the redemption value of the membership. Plaintiff responded by asking the board to reconsider the termination, and returned the redemption check without endorsement.

The board reviewed the matter, but in October 1981, despite a recommendation of the club's membership committee favorable to plaintiff's request, the board reaffirmed its prior action and refused to reinstate the Regular Family Membership in plaintiff's name, expressing its view that the governing bylaws precluded issuing her a proprietary membership. At the same time, however, the board adopted a resolution creating a new class of nontransferable, nonproprietary membership for persons, such as plaintiff, "who desire to use the golf club facilities, but who do not otherwise qualify for regular membership," and set the initiation fee for this new class of "golfing membership" at $10,000. (At that time, the initiation fee for a new Regular Family Membership was approximately $15,000.) The board invited plaintiff to apply for membership as a "golfing member under this new class of membership."

Plaintiff declined to accept the board's offer of what—on the basis of her status as a woman—she considered "second class citizenship membership" in the club. Plaintiff did not return to the club as a member after November 1981, and testified at trial that her real estate business suffered as a result of her loss of club membership.

Thereafter, plaintiff filed a complaint for damages and injunctive relief against the club and its board, alleging, among other causes of action, that the club's exclusion of women from proprietary membership and its action

terminating the Warfields' Regular Family Membership violated the Unruh Civil Rights Act and her common law right to fair procedure.[5] After initially granting a preliminary injunction, the trial court ultimately sustained a demurrer to plaintiff's amended complaint and dismissed the action in May 1982.

In the initial appeal in this matter, the Court of Appeal reversed the judgment of dismissal as to the causes of action alleging a violation of the Unruh Civil Rights Act and a denial of the common law right of fair procedure, concluding that, on the basis of the facts alleged, it could not be determined as a matter of law that the club's actions were not subject to the Unruh Civil Rights Act or that plaintiff's common law right of fair procedure had not been violated. (*Warfield* v. *Peninsula Golf & Country Club* (1989) 214 Cal.App.3d 646 [262 Cal.Rptr. 890].) The Court of Appeal remanded for a trial on those two causes of action. We denied defendant's petition for review.

The case went to trial on remand in September 1990.[6] Following the presentation of evidence disclosing the facts described above, the trial court granted the club's motion for a directed verdict, concluding that (1) plaintiff had failed to prove that the club was a "business establishment" within the meaning of the Unruh Civil Rights Act, and (2) plaintiff lacked standing to pursue a claim for denial of the right to fair procedure. In the second appeal, the Court of Appeal affirmed the judgment in favor of the club.

Plaintiff then sought review, limiting her challenge to the Court of Appeal's holding that the club did not constitute a business establishment for

---

[5]In a variety of settings, California courts have held that certain types of associations have a common law duty to follow minimum fair procedures in determining whether to admit or exclude members. (See, e.g., *Ezekial* v. *Winkley* (1977) 20 Cal.3d 267, 271-273 [142 Cal.Rptr. 418, 572 P.2d 32]; *Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 166 [81 Cal.Rptr. 623, 460 P.2d 495].)

[6]In July 1990, shortly before trial, the club revised its bylaws, eliminating the provision that restricted proprietary memberships to "adult males" and replacing it with a provision that provided instead that "Proprietary Memberships shall be held by Adults twenty-one years of age or older . . . ." Accordingly, as of July 1990, there apparently was no provision in defendant's bylaws that excluded women from obtaining proprietary membership. There is nothing in the record, however, indicating whether the club modified the provision of the bylaws providing that, upon dissolution of the marriage of a Regular Family Member in which the "female spouse" was awarded the membership, the membership could be terminated if the "male spouse" did not purchase the "female spouse's interest . . . ."

In any event, although the July 1990 bylaw revision changed the club's policy for the future, the club stood by its position that the male-only policy that was in effect in 1981 did not violate section 51, and that plaintiff was not entitled to any relief under this statute.

purposes of the Unruh Civil Rights Act.[7] We granted review to determine the proper application of the act in this context.

## II

In analyzing the issue whether the club constitutes a "business establishment" within the meaning of section 51, we begin with a brief review of the background and history of the Unruh Civil Rights Act and then proceed to a discussion of the past decisions of this court that bear most directly upon the question before us. With that background in mind, we shall better be able to set forth and evaluate the specific contentions made by the parties and their respective amici curiae.

## A

The origins and background of section 51 have been discussed at some length in a number of our prior decisions (see, e.g., *In re Cox* (1970) 3 Cal.3d 205, 212-216 [90 Cal.Rptr. 24, 474 P.2d 992]; *Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1150-1154 [278 Cal.Rptr. 614, 805 P.2d 873]), and, for present purposes, we believe it is sufficient briefly to summarize that history.

The general policy embodied in section 51 can be traced to the early common law doctrine that required a few, particularly vital, public enterprises—such as privately owned toll bridges, ferryboats, and inns—to serve all members of the public without arbitrary discrimination. (See generally, Tobriner & Grodin, *The Individual and the Public Service Enterprise in the New Industrial State* (1967) 55 Cal.L.Rev. 1247, 1250.) After the United States Supreme Court, in the *Civil Rights Cases* (1883) 109 U.S. 3 [27 L.Ed. 835, 3 S.Ct. 18], invalidated the first federal public accommodation statute, California joined a number of other states in enacting its own initial public accommodation statute, the statutory predecessor of the current version of

---

[7]At trial, the parties agreed that the question whether defendant club constitutes a "business establishment" within the meaning of the Unruh Civil Rights Act presented a question of law to be decided by the trial court, rather than a question of fact to be submitted to the jury. On appeal, plaintiff does not challenge the assumption that this determination—whether a club exhibiting the attributes possessed by defendant constitutes a "business establishment" under section 51—involves a question of law. (See *Rotary Club of Duarte* v. *Board of Directors* (1986) 178 Cal.App.3d 1035, 1050 [224 Cal.Rptr. 213] ["With these legal principles in mind, we proceed to decide whether International is a business establishment. *The resolution of this issue is one of law.*" (Italics added, fn. omitted.)].) As is illustrated by the cases discussed below, California decisions consistently have treated the issue whether a particular kind of entity constitutes a "business establishment" for purposes of section 51 as a question of statutory interpretation to be decided by the court.

section 51. (Stats. 1897, ch. 108, § 2, p. 137.) Expanding upon the limited category of "public service enterprises" to which the early common law doctrine applied, the 1897 statute, as amended in 1919 and 1923, provided that "[a]ll citizens within the jurisdiction of this state are entitled to the full and equal accommodations, advantages, facilities and privileges of inns, restaurants, hotels, eating houses, places where ice cream or soft drinks of any kind are sold for consumption on the premises, barber shops, bath houses, theaters, skating rinks, public conveyances and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law, and applicable alike to all citizens." (Stats. 1923, ch. 235, § 1, p. 485.) Thus, the 1897 statute, by its terms, specifically granted the right to "full and equal accommodations, advantages, facilities and privileges" in a number of specifically designated enterprises, as well as in "all other places of public accommodation or amusement."

In 1959, in apparent response to a number of appellate court decisions that had concluded the then-existing public accommodation statute did not apply to the refusal of a private cemetery, a dentist's office, and a private school to make their facilities available to African-American patrons (see *Long v. Mountain View Cemetery Assn.* (1955) 130 Cal.App.2d 328 [278 P.2d 945]; *Coleman v. Middlestaff* (1957) 147 Cal.App.2d Supp. 833 [305 P.2d 1020]; *Reed v. Hollywood Professional School* (1959) 169 Cal.App.2d Supp. 887 [338 P.2d 633]), the Legislature undertook, through enactment of the Unruh Civil Rights Act, to revise and expand the scope of the then-existing version of section 51. *As initially introduced*, the bill that ultimately was enacted into law proposed to revise the first paragraph of section 51 to provide: "All citizens within the jurisdiction of this State, no matter what their race, color, religion, ancestry, or national origin, are entitled to the full and equal *admittance*, accommodations, advantages, facilities, *membership, and privileges in*, or accorded by, *all public or private groups, organizations, associations*, business establishments, schools, and public facilities; to purchase real property; and to obtain the services of any professional person, group or association." (Assem. Bill No. 594 (1959 Reg. Sess.), as introduced Jan. 21, 1959, italics added.) Thereafter, the bill underwent a series of amendments in both houses of the Legislature.[8] As ultimately enacted in 1959, the relevant paragraph of section 51 provided: "All citizens within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in *all business*

---

[8]The complete progression of the bill through the Legislature is set forth in detail in Horowitz, *The 1959 California Equal Rights In "Business Establishments" Statute—A Problem In Statutory Application* (1960) 33 So.Cal.L.Rev. 260, 265-270.

*establishments of every kind whatsoever.*" (Stats. 1959, ch. 1866, § 1, p. 4424, italics added.) In subsequent years, this paragraph of section 51 was amended to add "sex" and "disability" to the specified categories of prohibited discrimination (see Stats. 1974, ch. 1193, § 1, p. 2568; Stats. 1987, ch. 159, § 1, p. 1094; Stats. 1992, ch. 913, § 3), but the paragraph otherwise has not been altered.

B

Since the enactment of the Unruh Civil Rights Act in 1959, questions concerning the proper interpretation of section 51 have come before this court on numerous occasions. In several cases, we have been faced with the question whether the statute encompasses discrimination on the basis of a particular characteristic or category that is not specifically listed in the statute. (See, e.g, *In re Cox, supra,* 3 Cal.3d 205 ["long hair and unconventional dress"]; *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161] [age]; *Harris* v. *Capital Growth Investors XIV, supra,* 52 Cal.3d 1142 [economic status].) That issue, of course, is not presented by the case now before us, because the challenged basis for defendant club's exclusion of plaintiff from proprietary membership—gender—is among the enumerated categories of discrimination prohibited by the terms of section 51. Instead, the question we must determine is whether the provisions of that statute apply to the entity before us in this case—that is, to defendant country club. To decide this issue, we must determine the intended scope of the statutory language that entitles all persons "to the full and equal accommodations, advantages, facilities, privileges, or services *in all business establishments of every kind whatsoever.*" (Italics added.)

As both parties recognize, three prior decisions of this court bear particularly upon the resolution of this issue. *Burks* v. *Poppy Construction Co.* (1962) 57 Cal.2d 463 [20 Cal.Rptr. 609, 370 P.2d 313] (*Burks*) was the first case in which this court had occasion to apply the Unruh Civil Rights Act. In *Burks,* the plaintiffs claimed that the defendants, a company and one of its employees who were engaged in developing, building, and selling a tract of houses, were violating the Unruh Civil Rights Act by allegedly refusing to sell homes in the tract to African-American customers on the same conditions offered to other customers. In discussing the scope of the statute, the court stated: "The Legislature used the words 'all' and 'of every kind whatsoever' in referring to business establishments covered by the Unruh Act (Civ. Code, § 51), and the inclusion of these words, without any exception and without specification of particular kind of enterprises, *leaves*

*no doubt that the term 'business establishments' was used in the broadest sense reasonably possible.* The word 'business' embraces everything about which one can be employed, and it is often synonymous with 'calling, occupations, or trade, engaged in for the purpose of making a livelihood or gain.' [Citations.] The word 'establishment,' as broadly defined, includes not only a fixed location, such as the 'place where one is permanently fixed for residence or business,' but also a permanent 'commercial force or organization' or 'a permanent settled position (as in life or business).' [Citations.] It is clear that defendants operated 'business establishments' within the meaning of the term as used in the Unruh Act." (57 Cal.2d at pp. 468-469, italics added.)

Although the defendant company in *Burks* did not deny that it was a "business establishment" within the ordinary meaning of that term, it nonetheless contended that, in light of the legislative history of section 51, the statute should not be interpreted to apply to defendant's conduct. Noting that the original version of the bill enacting section 51 included a specific reference to the right "to purchase real property," as well as other rights such as the obtaining of "professional services," and that those specific references were deleted in the final enactment of the Unruh Civil Rights Act, the defendant in *Burks* argued that section 51 should not be interpreted to apply to its conduct of developing and selling real property. This court squarely rejected the argument, explaining that "[t]hese deletions can be explained on the ground that the Legislature deemed specific references mere surplusage, unnecessary in view of the broad language of the act as finally passed. [Citations.]" (57 Cal.2d at p. 469.) The court further noted in this regard that "in the original bill the general term 'business establishments' was not, as now, followed by the words 'of every kind whatsoever' and that those words were added in the draft that deleted the specific reference to the purchase of real property." (*Ibid.*)

The second decision of this court bearing upon the issue now before us is *O'Connor* v. *Village Green Owners Assn.* (1983) 33 Cal.3d 790 [191 Cal.Rptr. 320, 662 P.2d 427] (*O'Connor*). A year before the *O'Connor* decision, the court held in *Marina Point, Ltd.* v. *Wolfson, supra,* 30 Cal.3d 721 (*Marina Point*), that the Unruh Civil Rights Act generally prohibits an apartment complex from excluding would-be residents solely on the basis of their age or the age of their children. The issue presented in *O'Connor* was whether the holding in *Marina Point* applied to a similar age-restriction policy embodied in the "covenants, conditions and restrictions" (CC&R's) of a condominium development. (33 Cal.3d at p. 792.)

In *O'Connor, supra,* 33 Cal.3d 790, the housing complex in question (the Village Green) was a 629-unit complex that originally had been operated as

an apartment complex but subsequently was converted into a condominium development. The CC&R's drafted and recorded at the time of the conversion created the Village Green Owners Association, a nonprofit organization whose membership consisted of all owners of the units at Village Green. As part of its functions, the homeowners association was authorized to enforce the CC&R's, including their age-restriction policy. In *O'Connor,* the homeowners association contended that *Marina Point, supra,* 30 Cal.3d 721, was inapplicable to its actions on the ground it was not a "business establishment" within the meaning of section 51.

In rejecting the homeowners association's contention that the nonprofit nature of the entity established that it was not a "business establishment" for purposes of the Unruh Civil Rights Act, the majority opinion in *O'Connor* stated: "Nothing in the language or history of [the Unruh Civil Rights Act] calls for excluding an organization from its scope simply because it is nonprofit. [Citation.] Indeed, hospitals are often nonprofit organizations, and they are clearly business establishments to the extent that they employ a vast array of persons, care for an extensive physical plant and charge substantial fees to those who use the facilities. The Village Green Owners Association has sufficient businesslike attributes to fall within the scope of the act's reference to 'business establishments of every kind whatsoever.' Contrary to the association's attempt to characterize itself as but an organization that 'mows lawns' for owners, the association . . . has a far broader and more businesslike purpose. The association, through a board of directors, is charged with employing a professional property management firm, with obtaining insurance for the benefit of all owners and with maintaining and repairing all common areas and facilities of the 629-unit project. It is also charged with establishing and collecting assessments from all owners to pay for its undertakings and with adopting and enforcing rules and regulations for the common good. In brief, the association performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlord's shoulders. A theme running throughout the description of the association's powers and duties is that its overall function is to protect and enhance the project's economic value. Consistent with the Legislature's intent to use the term 'business establishments' in the broadest sense reasonably possible (*Burks* v. *Poppy Construction Co., supra,* 57 Cal.2d at p. 468), we conclude that the Village Green Owners Association is a business establishment within the meaning of the act." (33 Cal.3d at p. 796.)

The plaintiffs in *O'Connor* observed, in support of their contention that the defendant association fell within the aegis of section 51, that "among the specific references in the original version of the bill were 'private or public

groups, organizations, associations, business establishments, schools and public facilities.' " (33 Cal.3d at p. 795.) In response to this argument, the court stated: "The broadened scope of business establishments in the final version of the bill, in our view, is indicative of an intent by the Legislature to include therein all formerly specified private and public groups or organizations that may reasonably be found to constitute 'business establishments of every type whatsoever.' " (33 Cal.3d at pp. 795-796.) The court then proceeded with the analysis, quoted above, explaining why the non-profit homeowner's association at issue in that case constituted a business establishment within the meaning of the act.

The third (and most recent) decision of this court to address the subject is *Isbister* v. *Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72 [219 Cal.Rptr. 150, 707 P.2d 212] (*Isbister*). The issue in *Isbister* was whether the provisions of section 51 applied to the admission policy of the Boys' Club of Santa Cruz, a nonprofit association that owned and operated a recreational facility for children, so as to prohibit the Boys' Club from excluding girls from use of the facility. In *Isbister*, a majority of this court concluded that the Boys' Club properly should be considered a "business establishment" for this purpose.

In *Isbister,* the court began its analysis with a review of the origins and legislative history of the Unruh Civil Rights Act, the history we have summarized above. Because that history demonstrated that the 1959 revision of section 51 was intended to expand the reach of the prior statute, the court reasoned in *Isbister* that, in the event the Boys' Club facility at issue constituted a "place of public accommodation or amusement" that would have been subject to the nondiscrimination strictures of the pre-1959 version of section 51, the facility also necessarily would constitute a "business establishment" within the meaning of the post-1959 version of section 51. Thereafter, the court in *Isbister* proceeded to explain why, in its view, the defendant in that case was, indeed, a "place of public accommodation or amusement" and thus a "business establishment" for purposes of the Unruh Civil Rights Act.

After noting that the facility in question—which included a swimming pool, gymnasium, and snack bar, as well as craft and game areas—"certainly qualifies as a 'place of amusement' " (*Isbister, supra,* 40 Cal.3d at p. 81), the court stated: "Moreover, the Club is classically 'public' in its operation. It opens its recreational doors to the entire youthful population of Santa Cruz with the sole condition that its users be male. [Citation.] There is no attempt to select or restrict membership or access on the basis of personal, cultural,

or religious affinity, *as a private club might do.*" (*Ibid.*, italics added.) The court then continued: "While there are some organized activities, the emphasis is on drop-in use of the Club's facilities, thus minimizing any sense of social cohesiveness, shared identity, or continuity. Boys who join the Club have no power in its affairs and no control over who else may be members. A fee, though not a large one, is charged for the annually renewable membership. Thus, the Club provides an atmosphere deemed characteristic of a 'public accommodation' by the principal commentator on the Unruh Act; relations "with and among its members are of a kind which take place more or less in 'public view,' and are of a 'relatively nongratuitous, noncontinuous, nonpersonal and nonsocial sort.' (Horowitz, *supra*, 33 So.Cal.L.Rev. 260, 287, 288.)" (40 Cal.3d at p. 81.) In an accompanying footnote, the court stated in *Isbister*: "Moreover, while members are expected to benefit from the general social values and opportunities the Club's environment promotes, as they would from many community activities, *the Club is not the selective, close-knit organization for which Professor Horowitz reserved the terms 'social' and 'personal.*'" (40 Cal.3d at p. 81, fn. 9, italics added.)

Finally, in responding to the objection that extension of the Unruh Civil Rights Act to the Boys' Club would "threaten all private organizations which traditionally serve the special cultural or charitable needs of particular minority groups with common interests" (*Isbister, supra*, 40 Cal.3d at p. 84), the majority in *Isbister* explained: "[W]e have emphasized that the Club's status as a 'business establishment' covered by the act arises from its 'public' nature; it offers basic recreational facilities to a broad segment of the population, excluding only a particular group expressly recognized by the Act as a traditional target of discrimination." (*Ibid.*, italics omitted.) And, in an accompanying footnote addressed to a dissenting opinion, the majority opinion further observed: "In a similar vein, Justice Mosk complains that our interpretation threatens many traditionally sex-segregated institutions, such as fraternities and sororities, private schools and scouting organizations. Nothing we have said compels that result. The Act covers 'business establishments' of every kind, and these include traditional 'public accommodations.' *Yet we have emphasized that the statute does not govern relationships that are truly private—to paraphrase Horowitz's words, those which are 'continuous, personal and social'* [citation] *and take place more or less outside 'public view.'* [Citation.] *'Private' groups and institutions do not fall prey to the Act simply because they operate 'nongratuitous' residential or recreational facilities for their members or participants; an accommodation must be 'public' to be covered.*" (40 Cal.3d at p. 84, fn. 14, italics added.)

## C

Having reviewed the general background and history of section 51 and the most pertinent decisions of this court interpreting the relevant language of the statute, we turn to the specific question presented: does section 51 apply to defendant country club? In addressing this issue, we consider first whether private social clubs, *as a general matter*, constitute "business establishments" within the meaning of section 51. Second, we consider whether, even if private social clubs do not necessarily or generally constitute "business establishments" for purposes of this statute, there are particular aspects of defendant's activities and operations that nonetheless bring the club within the reach of section 51's definition of a "business establishment."

1

■ In determining whether private social clubs, in general, fall within the aegis of the Unruh Civil Rights Act, we begin with the language of the statute. As we have seen, section 51 provides in relevant part that "[a]ll persons . . . are free and equal, and . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services *in all business establishments of every kind whatsoever*." (Italics added.) From the language of section 51, it is not self-evident that the statute applies, in general, to private social clubs, because such clubs do not plainly or obviously constitute "business establishments" within the ordinary usage of that term.

Relying upon several passages in this court's decisions in *Burks* and *O'Connor*, however, plaintiff contends that those cases establish that the Legislature's adoption of the phrase "all business establishments of every kind whatsoever" in the final, enacted version of the Unruh Civil Rights Act was intended to incorporate all entities and activities that had been included in the initial draft of the bill introduced in 1959. Because, as noted above (*ante*, p. 608), the *initial* version of the bill referred specifically to "membership . . . in . . . all public or private groups, organizations [and] associations," plaintiff maintains that all private associations and organizations, including private social clubs, constitute "business establishments" within the meaning of section 51.

In our view, the cited cases do not support plaintiff's reading. In *Burks*, *supra*, 57 Cal.2d 463, the court rejected the defendant developer's contention that, although it was a "business establishment" within the ordinary meaning of the term, the Legislature's elimination of the initial draft's specific reference to the right "to purchase real property" demonstrated an intent to exclude the business of selling real property from the reach of the Unruh

Civil Rights Act, observing that "[t]hese deletions can be explained on the ground that the Legislature deemed specific references mere surplusage, unnecessary in view of the broad language of the act as finally passed." (57 Cal.2d at p. 469.) Nothing in the opinion, however, suggests that the term "all business establishments of every kind whatsoever" was intended to encompass *all* of the entities or activities listed in the initial bill, without regard to whether such activities reasonably could be found to constitute a business establishment. Indeed, the court in *Burks*, in a subsequent passage distinguishing the scope of the Unruh Civil Rights Act from that of other legislation enacted the same year, specifically stated: "The Unruh Act relates only to discriminatory practices in 'business establishments.'" (57 Cal.2d at p. 469.)

The decision in *O'Connor, supra,* 33 Cal.3d 790, similarly fails to support plaintiff's contention. As we have noted, in *O'Connor* the court stated in this regard: "The broadened scope of business establishments in the final version of the bill, in our view, is indicative of an intent by the Legislature to include therein all formerly specified private and public groups or organizations *that may reasonably be found to constitute 'business establishments of every type whatsoever.'"* (33 Cal.3d at pp. 795-796, italics added.) As in *Burks*, nothing in *O'Connor* suggests that *all* private groups, organizations, or associations listed in the initial version of the bill invariably constitute "business establishments" under section 51; rather, *O'Connor* explains that such private groups or organizations are covered by section 51 *if* they "may reasonably be found to constitute 'business establishments of every type whatsoever.'" (33 Cal.3d at pp. 795-796.)

Finally, the reasoning of the *Isbister* decision confirms this conclusion. Were plaintiff's argument valid, the court in *Isbister* would have found that the Boys' Club was a business establishment under section 51 simply because of its status as a "private group or association" within the provisions set forth in the initial draft of the 1959 legislation. As we have seen, however, the court did not base its decision in *Isbister* upon any such reasoning, instead concluding that the Boys' Club was a "business establishment" under section 51 because (1) the term "business establishment" was intended to include any entity that would have been considered a "place of public accommodation or amusement" under the pre-1959 version of section 51, and (2) the Boys' Club was such a place of public amusement.

Although our prior decisions thus do not support the contention that a private social club, in general, constitutes a "business establishment" within the meaning of section 51 simply because of the status of such a club as a "private group, organization or association," those decisions *do* suggest that

the reach of section 51 cannot be determined invariably by reference to the apparent "plain meaning" of the term "business establishment." Neither the nonprofit condominium owners association in *O'Connor,* nor the nonprofit Boys' Club of Santa Cruz in *Isbister,* ordinarily would be thought of as a "traditional" business establishment. Nonetheless, the *O'Connor* and *Isbister* decisions concluded that the purpose and history of section 51 demonstrate that the Legislature intended the statute to apply to the conduct of the entities at issue in those cases. Thus, the circumstance that a private social club is not generally thought of as a traditional business establishment is not, in itself, necessarily determinative of whether such an entity falls within the aegis of the act.

As in our prior decisions, an historical perspective is helpful in determining whether section 51 properly should be interpreted to apply, in general, to the membership decisions of private social clubs, despite the circumstance that such clubs are not "business establishments" within the ordinary meaning of that term. Traditionally, statutes prohibiting discrimination in places of public accommodation have *not* been applied to the membership policies of private social clubs. As reflected in the congressional debates that culminated in the adoption of the Fourteenth Amendment to the United States Constitution and the original federal Civil Rights Acts, the drafters of those enactments drew a clear distinction between an individual's "civil rights" and his or her "social rights," viewing the right of nondiscriminatory access to places of public accommodation as a fundamental civil right but, at the same time, acknowledging that such protection against discrimination did not extend to access to another person's home or private club or, in general, to "social relations." (See, e.g., *Bell* v. *Maryland* (1964) 378 U.S. 226, 293 [12 L.Ed.2d 822, 836-837, 84 S.Ct. 1814] (conc. opn. of Goldberg, J.); *Civil Rights Cases, supra,* 109 U.S. 3, 59-60 [27 L.Ed. at pp. 855-856] (dis. opn. of Harlan, J.).)

In enacting the public accommodation provisions of the historic, federal Civil Rights Act of 1964, Congress specifically excluded private clubs from the reach of the statute (see 42 U.S.C. § 2000a(e)),[9] and truly private social clubs also generally have been excluded—either by explicit statutory exemption or by judicial interpretation—from the reach of the public accommodation statutes enacted in other states. (See, e.g., *United States Jaycees* v. *McClure* (Minn. 1981) 305 N.W.2d 764, 771] ["Private associations and organizations—those, for example, that are selective in membership—are

---

[9] The federal statute states in relevant part: "The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public . . . ." (42 U.S.C. § 2000a(e).)

unaffected by [the Minnesota public accommodations statute]"]; see generally, Note, *Discrimination in Access to Public Places: A Survey of State and Federal Public Accommodations Laws* (1978) 7 N.Y.U. Rev. L. & Soc. Change 215, 250-252.)

As noted above, California enacted its first public accommodation statute in 1897. There is no indication from the language of that statute (quoted in full, *ante*, at p. 608) that the provision was intended to apply to the membership decisions of private social clubs, and the decisions applying the statute do not suggest that the legislation had any such effect. (See, e.g., *Gardner* v. *Vic Tanny Compton, Inc.* (1960) 182 Cal.App.2d 506, 513-514 [6 Cal.Rptr. 490, 87 A.L.R.2d 113] [applying the pre-1959 version of section 51].)

Although the 1959 enactment of the current version of section 51 clearly was intended to expand the reach of the 1897 statute, the Legislature's adoption of language making the statute applicable to "all business establishments of every kind whatsoever" does not indicate that the contemplated expansion was intended, as a general matter, to encompass private social clubs.

Indeed, although this court previously has not had occasion to render a holding directed specifically to the applicability of section 51 to private social clubs, the reasoning and language of this court's decision in *Isbister*, *supra*, 40 Cal.3d 72—discussed and quoted above—quite clearly suggest that, at least as a general matter, the statute does not apply to truly private social clubs. As we have seen, in concluding the Boys' Club of Santa Cruz was subject to section 51, the court in *Isbister* relied expressly upon the circumstance that "the Club is classically 'public' in its operation. It opens its recreational doors to the entire youthful population of Santa Cruz, with the sole condition that its users be male. [Citation.] *There is no attempt to select or restrict membership or access on the basis of personal, cultural or religious affinity, as a private club might do.*" (40 Cal.3d at p. 81, italics added.) Further, the court also emphasized that "[b]oys who join the Club have no power in its affairs and no control over who else may be members" (*ibid.*), and that "the Club provides an atmosphere deemed characteristic of a 'public accommodation' by the principal commentator on the Unruh Act [in that] relations with and among its members are of a kind which take place more or less in 'public view,' and are of a 'relatively nongratuitous, noncontinuous, nonpersonal and nonsocial sort.' [Citation.]" (*Ibid.*) Finally, in response to the dissenting opinion's concern that the decision would threaten the membership policies of many traditionally gender-segregated organizations, such as fraternities and sororities, the court took pains in *Isbister* to

reemphasize the basis and limits of its holding, explaining: "The Act covers 'business establishments' of every kind, and these include traditional 'public accommodations.' *Yet we have emphasized that the statute does not govern relationships that are truly private—to paraphrase Horowitz's words, those which are 'continuous, personal and social'* [citation] *and take place more or less outside 'public view.'* [Citation.] *'Private' groups and institutions do not fall prey to the Act simply because they operate 'nongratuitous' residential or recreational facilities for their members or participants; an 'accommodation' must be 'public' to be covered.*" (40 Cal.3d at p. 84, fn. 14, italics added.)

Although, as is pointed out by an amicus curiae in support of plaintiff, the emphasized language from the *Isbister* decision technically is dictum, because no such private group was before the court in that case, we view this dictum as strong and persuasive. As we have explained, public accommodation statutes, as an historical matter, generally have not been applied to the membership policies of private social clubs that genuinely are selective in their membership and in which the relationship among members is continuous, personal, and social. By expanding the reach of California's public accommodation statute to guarantee equal accommodations in "all business establishments of every kind whatsoever," the Unruh Civil Rights Act firmly established the right of all persons to nondiscriminatory treatment by establishments that engage in business transactions with the public. But there is nothing in the language or history of the Unruh Civil Rights Act that indicates the Legislature intended, as a general matter, to bring the membership decisions of truly private social clubs within the reach of the statute.[10]

Accordingly, in light of both the language of section 51 and its origins and background, and of past judicial decisions applying the statute, we conclude that its provisions were not intended to apply to *all* private social clubs. Thus, defendant does not fall within the reach of the Unruh Civil Rights Act simply because of its status as a private social club.

2

Although we conclude that the provisions of section 51 do not apply to the membership decisions of a truly private social club, we hasten to add that an

---

[10]Indeed, in discussing the types of relationships that properly should be seen as *not* falling within the realm of the act, Professor Horowitz—in his contemporary law review commentary on the act—specifically concluded that "[m]embership clubs or organizations, e.g., *country clubs owned by and operated for the benefit of the members*, should be held not to fall within the scope of the statutory principle, because the relationship between discriminator and discriminatee is essentially continuous, personal and social." (Horowitz, *The 1959 California Equal Rights In "Business Establishments" Statute—A Problem In Statutory Application, supra*, 33 So.Cal.L.Rev. 260, 289-290, italics added.)

entity is not automatically exempt from the strictures of section 51 simply because it characterizes itself as a "private social club." The "private social club" rubric encompasses an enormous variety of groups and organizations, ranging from small book clubs or study groups of 10 or fewer persons, to international organizations with tens or even hundreds of thousands of members. As is demonstrated by numerous cases decided under the federal Civil Rights Act, an entity is not invariably immune from the nondiscrimination mandate of that statute simply because it exhibits some of the attributes of a private club. In similar fashion, an entity that, by virtue of its nature or operations otherwise would constitute a "business establishment" within the reach of the Unruh Civil Rights Act, is not outside the reach of the act simply because it possesses some of the characteristics of a private club.

The United States Supreme Court decision in *Daniel* v. *Paul* (1969) 395 U.S. 298 [23 L.Ed.2d 318, 89 S.Ct. 1697] provides perhaps the clearest and most obvious illustration of this principle. In rejecting the defendants' contention that their recreational facility—Lake Nixon—was a private club exempt from the public accommodation provisions of the Civil Rights Act of 1964, the high court explained: "Lake Nixon is not a private club. It is simply a business operated for a profit with none of the attributes of self-government and membership-ownership traditionally associated with private clubs. It is true that following enactment of the Civil Rights Act of 1964, the Pauls began referring to the establishment as a private club. They even began to require patrons to pay a 25-cent 'membership' fee, which gains a purchaser a 'membership' card entitling him to enter the Club's premises for an entire season . . . . But this 'membership' device seems no more than a subterfuge designed to avoid coverage of the 1964 Act. White persons are routinely provided 'membership' cards, and some 100,000 whites visit the establishment each season. . . . Negroes, on the other hand, are uniformly denied 'membership' cards, and thus admission. . . . The conclusion of the courts below that Lake Nixon is not a private club is plainly correct . . . ." (395 U.S. at pp. 301-302 [23 L.Ed.2d at p. 323].)

Other cases demonstrate that the same principle applies to nonprofit entities. In *Tillman* v. *Wheaton-Haven Recreation Assn.* (1973) 410 U.S. 431, 438 [35 L.Ed.2d 403, 409-410, 93 S.Ct. 1090], for example, the United States Supreme Court held that a nonprofit recreational association that was open to all Caucasian residents in a designated geographic area was not a "private club" exempt from the federal public accommodation law, because the association had "no plan or purpose of exclusiveness." Similarly, in *Sullivan* v. *Little Hunting Park* (1969) 396 U.S. 229, 236 [24 L.Ed.2d 386, 392, 90 S.Ct. 400], the Supreme Court confirmed that the defendant community park could not properly be considered a "private social club" exempt

from the federal Civil Rights Act, because "it is open to every white person within the geographic area, there being no selective element other than race."

In the past, numerous courts, both federal and state, have grappled with the question whether a particular entity properly should or should not be considered a private club whose membership decisions are exempt from a generally applicable public accommodation law. The cases identify a number of factors that may be relevant to this determination, including (1) the selectivity of the group in the admission of members, (2) the size of the group, (3) the degree of membership control over the governance of the organization (and particularly the selection of new members), (4) the degree to which club facilities are available for use by nonmembers, and (5) whether the primary purpose served by the club is social or business. (See, e.g., *Nesmith* v. *Young Men's Christian Ass'n of Raleigh, N.C.* (4th Cir. 1968) 397 F.2d 96, 98-102; *Cornelius* v. *Benevolent Protective Order of Elks* (D.Conn. 1974) 382 F.Supp. 1182, 1203-1204 [three-judge court]; *Wright* v. *Cork Club* (S.D. Tex. 1970) 315 F.Supp. 1143, 1150-1153; *United States Jaycees* v. *McClure, supra,* 305 N.W.2d 764, 770-771, affd. *Roberts* v. *United States Jaycees* (1984) 468 U.S. 609 [82 L.Ed.2d 462, 104 S.Ct. 3244].) Although no single factor has been viewed as controlling, many decisions consider the selectivity or lack of selectivity in the admission process to be of prime importance. As we have seen, most of these factors were considered by this court in *Isbister* in reaching the conclusion that the Boys' Club of Santa Cruz was a place of "public amusement" rather than a private club.

Plaintiff argues that, viewing these factors as a whole, the club here at issue should not be found to constitute a "truly private club" exempt from the provisions of section 51. Although plaintiff acknowledges that the record indicates the club admitted members only on a selective basis after investigation and interview, she suggests that in light of (1) the size of the total membership of the club (700 members plus their spouses and children), (2) the circumstance that only one-half of the members were proprietary members with the authority to govern the club and select new members, (3) the access enjoyed by nonmembers to the club's pro golf and tennis shops and to "sponsored events," and (4) the opportunity for obtaining advantageous business contacts provided by club membership, the club should not be categorized as a "private club" under the standard enunciated in the out-of-state decisions cited above. In addition, plaintiff, and a supporting amicus curiae, strongly contend that whether or not defendant constitutes a "private club" within the meaning of the statutory exemption of the federal Civil

Rights Act, or instead a "public accommodation" within the meaning of other states' "public accommodation" statutes, there are a number of "businesslike attributes" of defendant's operations that, in any event, render the club a "business establishment" within the meaning of section 51.

As we shall explain, we conclude that there is no need to determine whether defendant constitutes a "private club" rather than a place of public accommodation under the multipronged standard developed in the out-of-state cases, because we conclude that *the business transactions that are conducted regularly on the club's premises with persons who are not members of the club* are sufficient in themselves to bring the club within the reach of section 51's broad reference to "all business establishments of every kind whatsoever."

As summarized in the statement of facts at the outset of this opinion, the record establishes that defendant club is a nonprofit organization and that its operations are financed, in major part, by initiation fees, dues, and charges for goods and services paid by club members. At the same time, however, the record also discloses that, through a variety of activities, the club obtains both direct and indirect financial benefits from regular business transactions, conducted on its premises, with persons who are not members of the club.

First, the club regularly (on the average of once a week) permits nonmembers to use its facilities, for a fee, in connection with "sponsored events." In conducting such events, the club receives funds from nonmembers for the use of the club's golf course, tennis courts, and dining and bar facilities, and also obtains revenue from the sale (at a markup) of food and beverages to nonmembers at the club's snack bar and other dining facilities on the club's premises. In carrying on such activities for a fee, the club operates as the functional equivalent of a commercial caterer or a commercial recreational resort—classic forms of "business establishments"—and, indeed, presumably competes with business entities that offer comparable services and that clearly are subject to the strictures of section 51.

Second, the club also obtains income, on a regular basis, from fees charged for the use of its facilities, and the purchase of food and beverages on its premises, by nonmember "invited guests." Although the record does not establish what proportion of such guest charges is paid by club members and what proportion is paid by guests or from other sources, the record does indicate that in at least some instances these guest charges have been paid by companies or other business enterprises that are the employers of club members. To the extent the club obtains payment from nonmembers for

meals served to guests in the club's dining room, for drinks obtained by guests from the club's bar, and for guests' use of the club's golf course or other facilities, the club, once again, appears to have been operating in a capacity that is the functional equivalent of a commercial enterprise.

Finally, the record establishes that the club also obtains a significant, albeit indirect, financial benefit from the regular business transactions with nonmembers conducted at the golf and tennis pro shops located on its premises. As we have seen, these shops are open to members of the general public, who are permitted to take golf and tennis lessons from the golf and tennis professionals and to use the club's facilities in conjunction with such lessons. Although, under the contractual arrangement between the club and the golf and tennis professionals, the club does not receive a share of the income obtained from the pros' sale of goods or services either to members or nonmembers, the existence of these "satellite" public commercial enterprises on the club's premises nonetheless provides a significant indirect financial benefit to the club, because the arrangement enables the club to place golf and tennis professionals on the club's premises, identified as the club's own professionals and readily available to club members, at a monthly retainer that is much lower than the club would have to pay in the absence of such public commercial business enterprises. Furthermore, the potential inconvenience to club members that might result from the circumstance that the club professionals are permitted to serve nonmembers as well as members was minimized, because (as reflected by the record) there was a general understanding that the professionals would give priority to use of the club's facilities by club members. Under these circumstances, we believe that the golf and tennis pro shops, and the related services they provide, realistically must be viewed as an integral part of the club's overall operations. (Accord, *Nesmith* v. *Young Men's Christian Ass'n of Raleigh, N.C.*, *supra*, 397 F.2d 96, 98-100 [under the federal Civil Rights Act, local YMCA's health and athletic facilities could not be treated as a separate establishment from the YMCA's adjacent lodging and eating facilities that were open to the public]; *Fazzio Real Estate Co.* v. *Adams* (5th Cir. 1968) 396 F.2d 146, 148-149 [under the federal Civil Rights Act, although bowling alley was not itself a "covered establishment," it was subject to the act because a covered refreshment counter was located on its premises].)

In our view, because of the involvement of defendant's operations in the variety of regular business transactions with nonmembers discussed above, the club properly must be considered a business establishment within the

meaning of section 51. Although the club is a nonprofit organization, and there is no suggestion that the activities in question were intended to generate a profit that might be distributed to members, the direct and indirect financial benefits that the club derived from its business transactions with nonmembers nonetheless inured to the financial benefit of the club members, because the revenue from such transactions permitted the members to maintain the club's facilities and services—which were reserved primarily for the benefit of the members—through the payment of dues and fees lower than would have been required in the absence of the income obtained from nonmembers. In light of the explicit language of section 51 (encompassing "all business establishments of every kind whatsoever"), which, as this court observed in *Burks, supra*, 57 Cal.2d 463, 468, "leaves no doubt that the term 'business establishments' was used in the broadest sense reasonably possible," we conclude that defendant club's regular business transactions with nonmembers render it a "business establishment" for purposes of section 51.[11]

---

[11]We emphasize that the income that defendant derived from nonmembers was obtained as a result of *regular and repeated* business transactions with nonmembers. A private club that raises funds from nonmembers by conducting, for example, an occasional car wash, garage sale, or auction would not properly be considered a "business establishment," for purposes of section 51, by virtue of such isolated fund-raising activities.

There is nothing in the record to support the dissent's suggestion (see dis. opn., *post*, p. 634) that private golf or country clubs "historically" have engaged in the type or extent of regular business transactions with nonmembers conducted by defendant club, and nothing in Professor Horowitz's 1960 law review article on the Unruh Civil Rights Act (Horowitz, *The 1959 California Equal Rights In "Business Establishments" Statute—A Problem In Statutory Application, supra*, 33 So.Cal.L.Rev. 260, 289-290) suggests that such a club should not be considered a "business establishment" for purposes of section 51 even if it conducts regular business transactions with nonmembers. Moreover, although the evidence in the record pertaining to the financial details of the club's business transactions with nonmembers could be more complete, we believe that, contrary to the dissent's assertion (see dis. opn., *post*, p. 635), the testimony of the club's own managerial employees clearly indicates that the members of the club derived both direct and indirect financial benefits from the club's regular business transactions with nonmembers. Because the evidence in this case does not suggest that defendant regularly made its facilities, services, and goods available to nonmembers in a manner that avoided any direct or indirect financial benefit to club members, we have no occasion to determine whether a club would constitute a "business establishment" within the meaning of section 51 were it to conduct regular and repeated "business transactions" with nonmembers in such a manner.

Furthermore, our conclusion that the nature and activities of defendant club render it a business establishment for purposes of section 51 does not mean, of course, that the club, as a general matter, cannot establish and apply its own criteria for membership, but signifies only that the club may not arbitrarily exclude persons by discriminating on the basis of those "personal characteristics" to which section 51 applies. (See, e.g., *Harris v. Capital Growth Investors XIV, supra*, 52 Cal.3d 1142, 1154-1169.)

## III

Defendant contends, however, that even if, as a matter of statutory interpretation, the club constitutes a business establishment within the meaning of section 51, the trial court's ruling in its favor nonetheless should be upheld on constitutional grounds. Defendant maintains that application of section 51 to prohibit the club from excluding women from proprietary membership would represent an unconstitutional infringement of its members' rights of association and privacy under the federal and California Constitutions. (U.S. Const., 1st and 14th Amends.; Cal. Const., art. I, §§ 1-3.) As we shall explain, the governing authorities do not support defendant's constitutional claim.

In a series of cases decided over the past decade, the United States Supreme Court has addressed the question whether application of state and municipal antidiscrimination legislation to the membership policies of a number of private associations violated the federal constitutional rights of the members of those associations. (See *Roberts* v. *United States Jaycees*, *supra*, 468 U.S. 609; *Bd. of Dirs. of Rotary Int'l* v. *Rotary Club* (1987) 481 U.S. 537 [95 L.Ed.2d 474, 107 S.Ct. 1940]; *New York State Club Assn.* v. *New York City* (1988) 487 U.S. 1 [101 L.Ed.2d 1, 108 S.Ct. 2225].)

In *Roberts* v. *United States Jaycees*, *supra*, 468 U.S. 609, the seminal decision in this line of cases, the court addressed a constitutional challenge to a provision of the Minnesota Human Rights Act that had been interpreted as prohibiting the United States Jaycees, a nonprofit membership corporation that engages in a variety of civic, charitable, and lobbying activities, from excluding women from full membership. In analyzing whether such an application of the state antidiscrimination law violated the constitutional right of association of the organization's members, the court explained that there are two aspects of the constitutional right of association that must be considered in this context: (1) the freedom of intimate association, and (2) the freedom of expressive association. (468 U.S. at pp. 617-618 [82 L.Ed.2d at pp. 470-471].)

With regard to the freedom of intimate association, the court in *Roberts* noted that the highly personal relationships that are sheltered by this constitutional guaranty are exemplified by "those that attend the creation and sustenance of a family—marriage [citation], childbirth [citation], the raising and education of children [citation] and cohabitation with one's relatives [citation]." (468 U.S. at p. 619 [82 L.Ed.2d at p. 472].) The court explained: "Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not

only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty. Conversely, an association lacking these qualities—such as a large business enterprise—seems remote from the concerns giving rise to this constitutional protection. Accordingly, the Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees. [Citations.]

"Between these poles, of course, lies a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State. Determining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments. [Citation.] We need not mark the potentially significant points on this terrain with any precision. We note only that factors that may be relevant include size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." (468 U.S. at pp. 619-620 [82 L.Ed.2d at pp. 472-473].)

In *Roberts* itself, the high court went on to find that, for a number of reasons, the organization at issue in that case—the United States Jaycees—clearly was "outside of the category of relationships worthy of this kind of constitutional protection." (468 U.S. at p. 620 [82 L.Ed.2d at p. 473].) The court observed that the local chapters of the Jaycees "were large and basically unselective groups," noting that the Minneapolis chapter had approximately 430 members and the St. Paul chapter about 400 members, and that—"[a]part from age and sex"—no criteria were employed in recruiting or judging applicants for membership. (*Id.* at p. 621 [82 L.Ed.2d at p. 473].) The court also pointed out that, "despite their inability to vote, hold office, or receive certain awards, women affiliated with the Jaycees attend various meetings, participate in selected projects, and engage in many of the organization's social functions," and, indeed, that "numerous nonmembers of both genders regularly participate in a substantial portion of activities central to the decision of many members to associate with one another, including many of the association's community programs, awards ceremonies, and recruitment meetings." (468 U.S. at p. 621 [82 L.Ed.2d at pp. 473-474].)

With regard to the freedom of expressive association, the *Roberts* decision first explained that "we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." (468 U.S. at p. 622 [82 L.Ed.2d at p. 474].) The court then found that, unlike the freedom of intimate association, the freedom of expressive association was implicated in the *Roberts* case "[i]n view of the various protected activities in which the Jaycees engages" (*ibid.*), and that the state law at issue there—which, as noted, had been interpreted to require the Jaycees to admit members whom the association did not desire to include—had the potential of interfering with that right inasmuch as "[s]uch a regulation may impair the ability of the original members to express only those views that brought them together." (*Id.* at p. 623 [82 L.Ed.2d at p. 475].) Nonetheless, the court recognized that "[t]he right to associate for expressive purposes is not . . . absolute" and that "[i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." (*Ibid.*) The court in *Roberts* went on to hold that "Minnesota's compelling interest in eradicating discrimination against its female citizens justified the impact that application of the statute to the Jaycees may have on the male members' associational freedoms." (*Ibid.*)

In *Bd. of Dirs. of Rotary Int'l* v. *Rotary Club, supra,* 481 U.S. 537 (hereafter *Rotary Club*), the United States Supreme Court applied the principles articulated in *Roberts* to determine whether the constitutional rights of the members of Rotary International were violated by the decision of the California Court of Appeal in *Rotary Club of Duarte* v. *Board of Directors, supra,* 178 Cal.App.3d 1035, holding that the Unruh Civil Rights Act applied to that organization and prohibited it from excluding women from membership. Addressing first the question of freedom of intimate association, the United States Supreme Court concluded that, although membership in Rotary Clubs is not open to the general public, "the relationship among Rotary Club members is not the kind of intimate or private relation that warrants constitutional protection" (481 U.S. at p. 546 [95 L.Ed.2d at pp. 484-485]), the high court relying upon the size of local Rotary Clubs (from fewer than 20 members to more than 900), the regular change in membership of a typical club (approximately 10 percent change a year), the regular presence of strangers at many of the clubs' activities, and the public nature and character of the civic activities carried on by local clubs. (*Id.* at pp. 546-547 [95 L.Ed.2d at pp. 484-485].) With regard to the issue of freedom of expressive association, the court concluded that, although the evidence

indicated "Rotary Clubs engage in a variety of commendable service activities that are protected by the First Amendment" (*id.* at p. 548 [95 L.Ed.2d at p. 486]), there was no showing that application of the Unruh Civil Rights Act would require "the clubs to abandon their basic goals of humanitarian service, high ethical standards in all vocations, good will and peace" (*ibid.*), and further that "[e]ven if the Unruh Act does work some slight infringement on Rotary members' right of expressive association, that infringement is justified because it serves the State's compelling interest in eliminating discrimination against women." (481 U.S. at p. 549 [95 L.Ed.2d at p. 486].) Accordingly, the court held that "application of the Unruh Act to California Rotary Clubs does not violate the right of expressive association afforded by the First Amendment." (*Ibid.*)

The United States Supreme Court decision in *New York State Club Assn.* v. *New York City, supra,* 487 U.S. 1 (hereafter *New York State Club Assn.*) followed close upon *Roberts* and *Rotary Club.* In that case, the New York State Club Association brought a facial challenge to the constitutionality of a recently enacted New York City ordinance that had extended the application of the city public accommodation law to any " 'institution, club or place of accommodation [that] has more than four hundred members, provides regular meal service and regularly receives payment for dues, fees, use of space, facilities, services, meals or beverages directly or indirectly from or on behalf of nonmembers for the furtherance of trade or business.' " (487 U.S. at p. 6 [101 L.Ed.2d at p. 11].) The United States Supreme Court rejected the challenge, concluding that the city ordinance was not unconstitutional on its face.

In rejecting the claim that the ordinance represented an impermissible interference with club members' freedom of intimate association, the court in *New York State Club Assn.* explained: "The clubs that are covered under the Law contain at least 400 members. They are thus comparable in size to the local chapters of the Jaycees that we found not to be protected private associations in *Roberts,* and they are considerably larger than many of the local clubs that were found to be unprotected in *Rotary,* some of which included as few as 20 members. [Citations.] The clubs covered by [the city ordinance] also provide 'regular meal service' and receive regular payments 'directly or indirectly from or on behalf of nonmembers for the furtherance of trade or business.' [Citation.] The city found these two characteristics to be significant in pinpointing organizations which are 'commercial' in nature, 'where business deals are often made and personal contacts valuable for business purposes, employment and professional advancement are formed.' [Citation.] [¶] These characteristics are at least as significant in defining the

nonprivate nature of these associations, because of the kind of role that strangers play in their ordinary existence, as is the regular participation of strangers at meetings, which we emphasized in *Roberts* and *Rotary*. [Citations.] It may well be that a considerable amount of private or intimate association occurs in such a setting, as is also true in many restaurants and other places of public accommodation, but that fact alone does not afford the entity as a whole any constitutional immunity to practice discrimination when the government has barred it from doing so. [Citation.] Although there may be clubs that would be entitled to constitutional protection despite the presence of these characteristics, surely it cannot be said that [the ordinance] is invalid on its face because it infringes the private associational rights of each and every club covered by it." (*New York City Club Assn., supra*, 487 U.S. at p. 12 [101 L.Ed.2d at pp. 15-16].)

With regard to the effect of the city ordinance upon club members' right of expressive association, the court observed that the challenged measure "does not affect 'in any significant way' the ability of individuals to form associations that will advocate public or private viewpoints. [Citation.] It does not require the clubs 'to abandon or alter' any activities that are protected by the First Amendment. [Citation.] If a club seeks to exclude individuals who do not share the views that the club's members wish to promote, the Law erects no obstacle to this end. Instead, the Law merely prevents an association from using race, sex, and the other specified characteristics as shorthand measures in place of what the city considers to be more legitimate criteria for determining membership. It is conceivable, of course, that an association might be able to show that it is organized for specific expressive purposes and that it will not be able to advocate its desired viewpoints nearly as effectively if it cannot confine its membership to those who share the same sex, for example, or the same religion. In the case before us, however, it seems sensible enough to believe that many of the large clubs covered by the Law are not of this kind." (*New York State Club Assn., supra*, 487 U.S. at p. 13 [101 L.Ed.2d at p. 16].) Accordingly, the court concluded that "[t]he facial attack based on the claim that [the challenged ordinance] is invalid in all of its applications must therefore fail." (*Id.* at p. 14 [101 L.Ed.2d at p. 16].)

We believe that the teachings of the *Roberts, Rotary Club*, and *New York State Club Assn.* decisions make clear that application of section 51 to the country club at issue in the case presently before us does not violate the club members' federal constitutional right of association, with respect to either the freedom of intimate association or the freedom of expressive association.

To begin with, defendant country club does not contend that it was organized for, or regularly engages in, the type of expressive activities that

fall within the protection of the First Amendment. Thus, application of section 51 to the club will have no appreciable effect on its members' freedom of expressive association.[12]

Second, it is clear any claim that application of section 51 infringes upon club members' freedom of intimate association is untenable when the characteristics and the nature of the activities of defendant club are compared with the characteristics and activities of the organizations involved in the *Roberts*, *Rotary Club*, and *New York State Club Assn.* decisions. As an initial matter, the size of defendant's membership—700 members—is considerably larger than that of most of the local clubs involved in the *Rotary Club* case, and also falls well above the 400-member threshold established by the city ordinance at issue in the *New York State Club Assn.* case; indeed, because members' spouses and children under age 21 generally share the benefits of membership, the 700-member figure significantly understates the number of persons with unrestricted access to the club. Furthermore, as with the organizations involved in all three of the foregoing United States Supreme Court decisions, the premises and activities of defendant club are not narrowly restricted to club members (or their families). Instead, numerous nonmembers—invited guests, participants in sponsored events, and patrons of the golf and tennis pros—regularly are present at the club and, along with club members, make use of the club facilities. Finally, and perhaps most significantly, defendant club—like the organizations involved in the *Roberts* and *Rotary Club* cases—cannot persuasively claim that elimination of the men-only requirement for proprietary membership fundamentally will alter the *nature* of the club or its *specific purposes*. The club's golf, tennis, and other recreational and social facilities generally have been open to women, and women routinely have held nonproprietary classes of membership within the club.

Defendant contends, however, that even if United States Supreme Court decisions establish that application of the Unruh Civil Rights Act to the membership policies of the club does not infringe upon its members' *federal* constitutional right of association, application of the statute nonetheless violates its members' *state* constitutional right of privacy under article I,

---

[12]Because the application of section 51 to defendant country club will have no appreciable effect on the club members' freedom of expressive association, the United States Supreme Court's very recent decision in *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston* (1995) 515 U.S. __, __ [132 L.Ed.2d 487, 493-494; 115 S.Ct. 2338, 2340-2341]—holding that, under the First Amendment, a state public accommodation law may not be applied to require "private citizens who organize a parade to include among the marchers a group imparting a message the organizers do not wish to convey"—provides no support for the club's constitutional claim in the present case.

section 1, of the California Constitution. Although that state constitutional right provides protection that is distinct from, and in some respects greater than, that provided by the federal Constitution (see generally, *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 15-20 [26 Cal.Rptr.2d 834, 865 P.2d 633]), defendant has cited no authority that suggests the state constitutional provision properly should be interpreted to provide protection to the discriminatory membership policies of a large private country club, such as defendant, greater than the protection afforded by the federal Constitution. (See *Isbister, supra,* 40 Cal.3d 72, 85-86.) Particularly in light of the size of the club's membership, the regular business transactions in which the club engages with nonmembers, and the absence of any conflict between the inclusion of women and the nature or purpose of the club, we hold that application of the nondiscrimination provisions of the Unruh Civil Rights Act does not violate the members' right of privacy embodied in article I, section 1, of the California Constitution.

## IV

In sum, we conclude that the Court of Appeal erred in affirming the trial court's determination that the country club here at issue does not constitute a "business establishment" within the meaning of section 51. As we have explained, although a truly private social club generally would not constitute a "business establishment" for purposes of this provision, the club in question in the case now before us—because it engaged in a variety of "business transactions" with nonmembers on a regular basis—properly must be found, in light of this court's prior decisions, to fall within the very broad terms of section 51, which extend the act to "*all* business establishments *of every kind whatsoever.*" (Italics added.) Finally, we conclude that application of the Unruh Civil Rights Act to the membership policies of the club does not violate its members' rights of association and privacy under the federal and California Constitutions.

The judgment of the Court of Appeal is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

Kennard, J., Arabian, J., Baxter, J., and Werdegar, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—Although I concur in the majority's result, I decline to accompany them over the whole length of the route they take to arrive there. Specifically, I part company with them when they reiterate with approval the misguided and illogical reasoning of *Isbister* v. *Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72 [219 Cal.Rptr. 150, 707 P.2d 212] (*Isbister*). The concept that a small "swim and gym" club for boys

is a "business establishment" was incomprehensible when proffered by a majority of this court (see dis. opns. of Mosk, J., *id.* at p. 93, & Kaus, J., *id.* at p. 98), and it has not gained stature or even plausibility with the passage of time.

Civil Code section 51 provides that regardless of "sex, race, color, religion, ancestry, national origin, or disability" all persons subject to California law "are entitled to . . . full and equal *accommodations*, advantages, facilities, privileges, or services *in all business establishments of every kind whatsoever*." (Italics added.) In defiance of that plain language, *Isbister* stands for a rule that this court may alchemically transform a nonbusiness into a business when it finds purported sex discrimination.

Of course, I share the majority's disquiet about sex discrimination. The loss of human capital occasioned by centuries of mindless sex discrimination is beyond calculation. We can only estimate its magnitude as we witness women's recent achievements in the worlds of work, politics and governance, the arts, and professional and amateur athletics, now that denial of opportunity and damage to self-esteem have somewhat diminished. Defendant country club's treatment of plaintiff may well appear totally alien to future generations.

But regardless of the destructiveness of invidious sex discrimination, we cannot ordinarily dictate to private groups whom they must admit when the Legislature has chosen not to address the question. In this case the Unruh Civil Rights Act does provide plaintiff a remedy, because defendant country club appears to be operating as a business establishment. In the case of *Isbister*'s plaintiffs, however, the statute did not provide a remedy; indeed, a youngster's 25-cent sidewalk lemonade stand is more a business establishment than was the Boys' Club of Santa Cruz. The *Isbister* majority managed the rare feat of flouting the will of both the California Legislature and Congress when they concluded that an affiliate of an association congressionally chartered at the time "to promote the health, social, educational, vocational, and character development of *boys*" (former 36 U.S.C. § 693, italics added; see now 36 U.S.C. §§ 691, 693 ["Boys & Girls' Clubs of America" chartered to promote these qualities in "youth[s]"]) would be an even worthier endeavor if it was required to do the same for *girls*. Maybe so, but that was not the law.

Because *Isbister*'s strained reasoning so evidently runs counter to the Unruh Civil Rights Act—the law proscribes discrimination in "accommodations" only in all "business establishments," not wherever human beings may

choose to gather—that opinion is guaranteed to cause mischief in future cases. There is a vast array of voluntary associations, nonprofit organizations, and charitable groups of all kinds dependent on our interpretation of the Unruh Civil Rights Act. (See, e.g., the list of amici curiae who appeared on behalf of the Boys' Club of Santa Cruz in *Isbister, supra*, 40 Cal.3d 72, 93 (dis. opn. of Mosk, J.).) Our interpretation must therefore rely on rigorous analysis of the legislative language and purpose, not on the personal views of individual judges regarding a preferred composition of a private noncommercial organization.

The majority in this case have no need to cite *Isbister* with approval. Instead of relying simply on the plain facts of this case, they dilute the persuasiveness of their conclusion by appearing to depend in part on that opinion's obviously misguided reasoning.

I also note that the majority euphemistically refer to "gender" discrimination, as if plaintiff were refused membership because of her femininity rather than her sex. (See *J.E.B.* v. *Alabama* ex rel. *T.B.* (1994) 511 U.S. ___, ___, fn. 1 [128 L.Ed.2d 89, 114, 114 S.Ct. 1419] (dis. opn. of Scalia, J.).) In fact the Unruh Civil Rights Act says nothing about gender discrimination.

Nevertheless, I concur with the majority that the defendant country club in the case at bar appears to be operating as a business establishment, and hence that the Unruh Civil Rights Act bars it from discriminating on the basis of sex.

**LUCAS, C. J.**—I respectfully dissent.

Civil Code section 51, also known as the "Unruh Civil Rights Act" (hereafter section 51) was never intended to apply to the membership decisions of private clubs such as defendant. I do not condone the apparent discrimination in which defendant has engaged. In fact, I find it short-sighted and backward. My personal views, however, are irrelevant. Our judicial role is to apply the law, not to make it. If the statute is to be recast, the Legislature, and not this court, must do so. Because the majority usurps the legislative function and oversteps its judicial role, I am compelled to dissent.

Section 51 provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, or disability, are entitled to the full and equal accommodations, advantages, facilities, privileges or services *in all business establishments of every kind whatsoever.*" (Italics added.)

The majority correctly rejects plaintiff's broad assertion that "all private associations and organizations, including private clubs, constitute 'business establishments' within the meaning of section 51." (Maj. opn., *ante*, at p. 614.) As the majority properly concludes after reviewing the relevant cases (*id.* at pp. 609-613), "there is nothing in the language or history of the Unruh Civil Rights Act that indicates the Legislature intended, as a general matter, to bring the membership decisions of truly private social clubs within the reach of the statute." (*Id.* at p. 618.)

The majority also correctly observes that an entity that, by virtue of its nature, purpose, and structure, otherwise would fall within the reach of the Unruh Civil Rights Act, cannot avoid the nondiscrimination mandate of the statute merely by donning the cloak of a private social club. (Maj. opn., *ante,* at p. 619.) It concludes, however, that it need not "determine whether defendant constitutes a 'private club' rather than a place of public accommodation" under the criteria traditionally employed to make that assessment (*id.* at p. 621) because "*the business transactions that are conducted regularly on the club's premises with persons who are not members of the club* are *sufficient in themselves* to bring the club within the reach of section 51's broad reference to 'all business establishments of every kind whatsoever.' " (*Ibid.*, first italics in original, second added.)

There is no basis for the majority's assumption that the Legislature intended to regulate the activities of private social clubs under section 51 whenever such clubs conduct regular business transactions on premises with nonmembers. Nor is there any basis in the record to support the majority's assumption that such transactions inured to the financial benefit of defendant's club members. Finally, the criteria traditionally employed to determine whether an entity is a "business enterprise"—factors outlined but ultimately ignored by the majority in favor of its novel and suspect "regular business transactions" approach—show that defendant should be treated as an entity whose membership decisions are exempt from the generally applicable public accommodation law.

I.

## THE MAJORITY'S "REGULAR BUSINESS TRANSACTIONS" ANALYSIS

The majority asserts defendant obtains direct "financial benefits from regular business transactions, conducted on its premises, with persons who are not members of the club." (Maj. opn., *ante*, at p. 621.) Namely, the club "regularly . . . permits nonmembers to use its facilities, for a fee, in connection with 'sponsored events.' . . . In carrying on such activities for a

fee, the club operates as the functional equivalent of a commercial caterer or a commercial recreational resort—classic forms of 'business establishments'. . . ." (*Ibid.*) In addition, the majority observes, defendant obtains fees from nonmember "invited guests" for the use of club facilities, and for purchase of food and beverages on premises (*ibid.*), and it again reasons: "To the extent the club obtains payment from nonmembers for meals served to guests in the club's dining room, for drinks obtained by guests from the club's bar, and for guests' use of the club's golf course or other facilities, the club, once again, appears to have been operating in a capacity that is the functional equivalent of a commercial enterprise." (*Id.* at pp. 621-622.) Finally, the majority notes, club members benefit indirectly from regular business transactions between nonmembers and the golf and tennis pros on the club's premises. (*Id.* at p. 622.)

The majority concludes that these various "regular business transactions" with nonmembers render defendant a business establishment under section 51. It finds "the direct and indirect financial benefits that the club derived from its business transactions with nonmembers . . . *inured to the financial benefit* of the club members, because the revenue from such transactions permitted the members to maintain the club's facilities and services—which were reserved primarily for the benefit of the members—through the payment of *dues and fees lower* than would have been required in the absence of the income obtained from nonmembers." (Maj. opn., *ante*, at p. 623, italics added.)[1]

The majority's analysis is faulty in two respects. First, private clubs like defendant have historically acted in the manner described by the majority, i.e., they have long allowed nonmembers, when sponsored by a member, to make use of club facilities for weddings and special events, etc., on a fee-for-use basis, or as invited guests. In so operating, "country clubs" have traditionally engaged in regular on-premises "business transactions" with nonmembers, and have long derived a financial benefit to the extent that such fees may diminish the contributions required by club members to operate their establishment. The majority provides no reason to suspect this was not the norm for private country clubs in 1959, when the Unruh Civil Rights Act was enacted,—and when it was generally understood that "[m]embership clubs or organizations, e.g., *country clubs owned by and*

---

[1]Similarly, the majority, *ante*, at page 599, asserts that "[b]ecause such 'business transactions' with nonmembers are conducted on a regular and repeated basis and constitute an integral part of the club's operations—supplementing the members' own financial contributions and reducing the dues and fees that members otherwise would be required to pay in order to maintain the club's facilities and operations—we conclude that the club [is a 'business establishment' under section 51]."

*operated for the benefit of the members*," did *not* "fall within the scope of the statutory principle . . . ." (Horowitz, *The 1959 California Equal Rights In "Business Establishments" Statute—A Problem In Statutory Application* (1960) 33 So.Cal.L.Rev. 260, 289, italics added [hereafter Horowitz].)

Indeed, it would astound those who drafted and enacted section 51 to learn, 36 years later, that private country clubs have always been within the statute, so long as they regularly do what such clubs traditionally have done, i.e., allow nonmembers to use their facilities for a fee and under the sponsorship of a member. I cannot acquiesce in the majority's revisionist interpretation of section 51.

Second, I question the majority's application of its own test. The assumption underlying much of its analysis is that the club's "commercial-like" activities are intended to operate in the black—i.e., to generally produce a net financial benefit rather than merely break even or produce a loss. Only then could those activities *reduce* the fees and dues that club members would otherwise be required to pay.

The majority, however, offers little to support its assumption, because, as it concedes, the record contains scant information on this point. Although there was testimony that the club imposed a "markup" on food and drink sold to members and nonmembers, the record contains no testimony about whether this "markup" simply covered costs, or whether it produced a profit or loss. Similarly, although the record discloses that "greens fees" charged during "sponsored events" were "higher than that charged at other times" (maj. opn., *ante,* at p. 601), this tells us nothing about whether those fees charged to nonmembers were set to cover costs, make a profit, etc. Accordingly, there is no clear record evidence about whether, for example, the "sponsored events" the majority relies on are self-sustaining (i.e., break even), make a profit, or lose money (and hence require subsidization *by club members*). Indeed, we do not even know how much money is involved in the transactions on which the majority bases its conclusion. We may infer from the record that no more than $75,000 (and possibly much less) of defendant's 1981 total receipts of $1.5 million were attributable to sponsored events. (Maj. opn., *ante*, at p. 602 & fn. 3.) We simply do not know the amount of money received for goods and services incurred by invited guests. Given the state of the record, I find no evidentiary support for the majority's conclusion that these "regular" transactions with nonmembers constitute a sufficient portion of defendant's gross receipts to render the club a "business establishment" under section 51. Nor do I find any record support for the majority's assumption that these transactions actually work to reduce the club members' fees and dues.

Furthermore, the majority's approach raises an important issue for private clubs such as defendant that, no doubt, wish to conduct their affairs within the law. Specifically, may a club such as defendant avoid the majority's interpretation of section 51 by simply structuring its fees and charges to nonmembers in a fashion that guarantees the club will incur no net financial benefit from its regular transactions with nonmembers? In other words, it would appear that under the majority's analysis, a private club such as defendant would not fall within the purview of section 51 if it conducted its transactions with nonmembers on a "break even" basis.

Ultimately, the majority casts doubt even on its novel "net financial benefit" rationale. It suggests that, regardless whether on-premises transactions with nonmembers inure to the financial benefit of club members, private clubs such as defendant may fall within section 51 simply by virtue of the fact that commercial on-premises transactions with nonmembers regularly occur. (See maj. opn., *ante*, at pp. 620-621; see also *id.* at pp. 622-623 & 629-630.) Indeed, at the conclusion of its analysis, the majority concedes that it leaves private clubs such as defendant at risk of violating section 51 so long as they "regularly" conduct on-premises commercial transactions with nonmembers, *even if those transactions do not inure to the financial benefit of club members*. (See maj. opn., *ante*, at fn. 11, p. 623.)

In summary, the majority suggests no basis for believing the 1959 Legislature that enacted section 51 would have intended to cover private clubs such as defendant merely because the entity engages in regular on-premises commercial transactions with nonmembers. Similarly, I find no support in the history of the statute, and the majority cites none, for the proposition that, to the extent such transactions inure to the direct financial benefit of club members, the club becomes a business establishment under section 51. Finally, there is nothing in the record to support the majority's conclusion that the transactions at issue here inured to the direct financial benefit of the club's members.

II.

THE TRADITIONAL ANALYSIS NOT TAKEN

The proper criteria for deciding whether defendant's membership decisions should be subject to section 51 are set out—but not applied—by the majority: "The cases identify a number of factors that may be relevant to this determination, including (1) the selectivity of the group in the admission of members, (2) the size of the group, (3) the degree of membership control over the governance of the organization (and particularly the selection of

new members), (4) the degree to which club facilities are available for use by nonmembers, and (5) whether the primary purpose served by the club is social or business. [Citations.] Although no single factor has been viewed as controlling, many decisions consider the selectivity or lack of selectivity in the admission process to be of prime importance. As we have seen, most of these factors were considered by this court in *Isbister* [v. *Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72 (219 Cal.Rptr. 150, 707 P.2d 212)] in reaching the conclusion that the Boys' Club of Santa Cruz was a place of 'public amusement' rather than a private club." (Maj. opn., *ante*, at p. 620.)

After a careful application of these traditional criteria, both the trial court and the Court of Appeal determined that defendant properly should be considered a private club whose membership decisions are not subject to the provisions of section 51. I agree.

First, defendant's process for choosing and admitting proprietary members is very selective. The club does not advertise for, or publicly solicit, new members. A prospective member can be proposed for membership only by a current member, and a membership committee, made up of existing members, conducts a thorough investigation and numerous interviews with the prospective member to assure social compatibility of the prospective member with the current members. Thus, unlike in *Isbister* v. *Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72 [219 Cal.Rptr. 150, 707 P.2d 212] (*Isbister*), in which club membership was open to all boys in the community on a nonselective basis, defendant strictly limits its membership in an attempt to create a socially compatible, close-knit organization.

Second, the size of the proprietary membership of the club—limited to 350 members—also is compatible with the status of a private social club. Although the size of the membership suggests the club may not constitute an intimate social group in which all members are close personal friends, the club is considerably smaller than the national and international service organizations that several decisions have determined do not qualify as "private" clubs exempt from public accommodation statutes. (See *United States Jaycees* v. *McClure* (Minn. 1981) 305 N.W.2d 764, affd. *Roberts* v. *United States Jaycees* (1984) 468 U.S. 609 [82 L.Ed.2d 462, 104 S.Ct. 3244] [United States Jaycees; 295,000 members]; *Rotary Club of Duarte* v. *Board of Directors* (1986) 178 Cal.App.3d 1035 [224 Cal.Rptr. 213], affd. *Bd. of Dirs. of Rotary Int'l* v. *Rotary Club* (1987) 481 U.S. 537 [95 L.Ed.2d 474, 107 S.Ct. 1940] [Rotary International; 900,000 members].) In this regard, I note the State of New York recently enacted legislation expanding that state's public accommodation statute to cover private clubs that have more

than 100 members and that provide regular meal service and regularly receive payment for meals, beverages, or services "from or on behalf of a nonmember for the furtherance of trade or business." (N.Y. Exec. Law, § 292, subd. 9 (as amended by 1994 N.Y. Laws, ch. 262).) Our Legislature, however, has not enacted a similar amendment to section 51, and in the absence of such legislative action we cannot conclude that the size of defendant's membership itself is sufficient to render the country club a "business establishment" within the meaning of section 51.

The remaining criteria also support the conclusion that defendant is a private club. It is owned by the proprietary members, and those members, through an elected board of directors, make all policy decisions relating to governance of the club, including the selection of new members. In light of this structure, the relationship between a prospective member and the "proprietor" of the club—i.e., the current club members—involves a continuing personal and social relationship, one quite different from the proprietor-customer relationship that typifies an ordinary business transaction. (See Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 281, fn. 78 ["If the 'members' do not own and control the enterprise, they are in effect simply patrons of the proprietor, and the critical proprietor-patron relationship is then no different than that of, *e.g.*, innkeeper and patron."].)

The club's policies concerning access to, and use of, the facilities by nonmembers also are consistent with defendant's status as a private club, at least with regard to the exemption of the club's membership decisions from the application of section 51. As a general matter the club's facilities are open only to club members, their families, and invited guests. Past cases demonstrate that a member-owned-and-operated club does not forfeit its status as a private club simply because it permits its members to invite nonmember guests to use the facilities. (Cf. *Moose Lodge No. 107* v. *Irvis* (1972) 407 U.S. 163, 171 [32 L.Ed.2d 627, 636, 92 S.Ct. 1965]; *Wright* v. *Cork Club* (S.D.Tex. 1970) 315 F.Supp. 1143, 1151-1152.) Similarly, the fact that the club permits its members to sponsor occasional events at the club—such as golf tournaments, weddings, or bar mitzvahs—attended by nonmembers, that the golf and tennis pro shops on its premises are open to nonmembers as well as to members, and that club employees frequently are permitted to use the facilities on the day of the week that the club is closed to members, do not in themselves demonstrate that the club should not

properly be considered a private social club with respect to its membership decisions.[2]

Finally, the lower courts properly concluded that defendant's primary function and purpose are recreational and social, rather than business oriented, and that this characteristic further supports the conclusion that defendant is a private club under section 51. To be sure, the fact that the club is a recreational facility does not, in itself, demonstrate the inapplicability of section 51. As our decision in *Isbister, supra,* 40 Cal.3d 72, clearly demonstrates, our public accommodation statute long has applied to places of public amusement, and were the club's facilities operated as a for-profit enterprise, there would be no question but that section 51 would apply to the use of all of its facilities. But in deciding whether a nonprofit private club properly should be considered a "business establishment" whose membership decisions are subject to section 51, the social and recreational focus of the club's activities is significant, because it suggests that the relationships among members that the club is intended to foster are largely social and personal relationships—the type of relationships to which public accommodation statutes traditionally have *not* applied—rather than business relationships. (Cf. *Rotary Club of Duarte* v. *Board of Directors, supra,* 178 Cal.App.3d 1035, 1055-1058; *United States Jaycees* v. *McClure, supra,* 305 N.W.2d 764, 768-769.)

Plaintiff asserts, however, that even if the social and recreational aspects of defendant club predominate over its business-oriented elements, such a club still is a valuable source of potential business contacts, and the club's discriminatory exclusion of women from membership inevitably will have an adverse impact on plaintiff's and other women's opportunities in the

---

[2]The use of the club's facilities by nonmembers raises a potential issue as to the applicability of section 51 that is not presented by the facts before us. In a number of cases decided under the public accommodation statutes of other states, courts have concluded that when a private club makes its facilities available to persons who are not members of the club, the club may not discriminatorily exclude from such access a segment of the community on the basis of a classification that would not be permitted under the public accommodation statute. (See, e.g., *Commonwealth, Hum. R. Com'n* v. *Local Ord. of Moose* (1972) 448 Pa. 451 [294 A.2d 594, 597]; *Batavia Lodge No. 196* v. *N.Y. State Div. of Human Rights* (1974) 35 N.Y.2d 143 [359 N.Y.S.2d 25, 316 N.E.2d 318].) A serious question under section 51 would be presented if defendant, in opening its facilities for use by nonmembers in a sponsored event, proposed to preclude the attendance of any guests on the basis of their particular race or gender, or on some other criterion prohibited by law. In the present case, however, there is no claim that defendant has imposed any such discriminatory policy with regard to the use of its facilities by nonmembers, and thus we have no occasion to address the applicability of section 51 to such conduct. We need hold only that the club's policies relating to the use of its facilities by nonmembers do not subject *the membership decisions* of the club to the provisions of section 51.

business world. There is no denying that plaintiff's point has considerable force as a matter of policy, and, indeed, it was just such policy considerations that led lawmakers in New York City to expand the reach of that city's Human Rights Law to encompass a designated category of private clubs. (See *New York State Club Assn.* v. *New York City* (1988) 487 U.S. 1, 5-6 [101 L.Ed.2d 1, 10-11, 108 S.Ct. 2225] [quoting statement of legislative purpose].) But although such policy considerations properly may lead a legislative body to decide that a particular category of private clubs should be brought within the coverage of a public accommodation law, in the absence of such specific legislative action the considerations on which plaintiff relies provide no appropriate basis for *a court* to find that a *private* club is a "business establishment" within the reach of a general *public* accommodation statute such as section 51.

Plaintiff's argument affords no principled basis on which this court may determine which private clubs should or should not be considered "business establishments" for purposes of section 51. Granted, social contacts such as those available at defendant's club may well prove to have considerable value in a business context. But as the majority explains (maj. opn., *ante*, at p. 616), public accommodation statutes historically have been intended to protect "civil," as distinguished from "social," rights. Accordingly, although the policy considerations proffered by plaintiff arguably constitute weighty grounds to support a legislative decision to expand the scope of section 51 to cover at least some private country clubs and similar groups, the strength of plaintiff's policy arguments do not alter the conclusion that section 51, in its present form, was not intended to apply to the membership decisions of a private country club like defendant.

### III.

### "BUSINESSLIKE ATTRIBUTES"

Plaintiff further contends that even if, by its nature and purpose, a private country club does not *necessarily* constitute a "business establishment" within the meaning of section 51, defendant possesses sufficient "businesslike attributes" to render it a "business establishment" under the reasoning of this court's decision in *O'Connor* v. *Village Green Owners Assn.* (1983) 33 Cal.3d 790 [191 Cal.Rptr. 320, 662 P.2d 427] (*O'Connor*). As explained by the majority, *ante*, at pages 610-612, in *O'Connor* we held a defendant nonprofit condominium owners association had "sufficient businesslike attributes to fall within the scope of the act's reference to 'business establishments of every kind whatsoever.' " (33 Cal.3d at p. 796.) Plaintiff in the

present case maintains that defendant has many of the same attributes as the condominium owners association in *O'Connor*. In this regard, plaintiff relies on the relatively large number of persons (between 80 and 110) employed by defendant, the extensive land and facilities owned by the club, and the fact that both club members and guests pay substantial fees for services, food, and beverages obtained at the club.

These attributes of defendant do not demonstrate that it properly should be considered among the "business establishments of every kind whatsoever" contemplated by section 51.

First, employment of numerous persons and ownership of significant land and facilities do not invariably constitute hallmarks of a "business establishment." If a club is a "private social club" in light of the various factors discussed above, the fact that it employs many persons and owns considerable property does not transform it into a business establishment for purposes of its membership decisions. Conversely, the modest facilities and small number of persons employed by a commercial entity would not shield it from application of section 51.

Second, with regard to defendant's policy of charging members and their guests for services, food, and beverages provided by the club, this court specifically spoke to the effect of such a practice in our decision in *Isbister*, *supra*, 40 Cal.3d 72, in which we emphasized that " '[p]*rivate' groups and institutions do not fall prey to the Act simply because they operate 'nongratuitous' residential or recreational facilities for their members or participants; an 'accommodation' must be 'public' to be covered.*" (40 Cal.3d at p. 84, fn. 14, italics added.) Accordingly, simply because the members of a private club have chosen to finance activities at the club on a pay-as-you-go basis does not render the club a "business establishment" within the meaning of section 51.

A conclusion that the club at issue here does not possess sufficient businesslike attributes to render it a "business establishment" for purposes of section 51 is in no way inconsistent with *O'Connor*, *supra*, 33 Cal.3d 790. As explained by the majority, the issue in *O'Connor* was whether the policy of the defendant condominium owners association, of excluding all families with children from the condominium complex, violated section 51, in light of our previous determination, in *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721 [180 Cal.Rptr. 496, 640 P.2d 115] (*Marina Point*), that an apartment complex's comparable policy of excluding families with children from housing was unlawful under section 51. In reaching the conclusion that

the condominium owners association in *O'Connor*, like the apartment complex owner in *Marina Point*, constituted a "business establishment" for purposes of section 51, the court in *O'Connor* relied on its determination—after a review of the purpose and function of the condominium owners association—that, "[i]n brief, the association performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlord's shoulders." (33 Cal.3d at p. 796.) In other words, the *O'Connor* decision was premised on the assumption that the condominium association occupied the position of landlord or proprietor insofar as it possessed the authority to enforce a discriminatory policy of exclusion, and for that reason, the association represented a type of "business establishment" to which section 51 was intended to apply. In the present case, by contrast, the club's discriminatory policy with respect to proprietary membership—despite its incidental effect on plaintiff's access to potential business contacts—does not deprive plaintiff of the opportunity to enter into a commercial transaction, but rather denies her the opportunity to enter into the social relationship embodied in club membership.

Accordingly, defendant does not have sufficient businesslike attributes to render it a "business establishment" under section 51, at least with respect to its membership decisions. (See *ante,* fn. 2 at p. 639.)

## IV.

### LEGISLATIVE POLICY CHOICES

For the reasons discussed above, it is clear that the current provisions of section 51 were not intended to apply to the membership decisions of a private country club like defendant. As I have noted, although in recent years other states have amended their public accommodation statutes specifically to cover some designated aspects of such private clubs, the California Legislature has not enacted any similar modification of section 51.

Concerns raised by the discriminatory membership practices of private clubs, however, have by no means entirely escaped the California Legislature's attention. Within the past decade, the Legislature has enacted a number of statutes that explicitly bar individuals and corporations from claiming a tax deduction, for what otherwise would be a deductible trade or business expense, with regard to any expenditure made at a club that "restricts membership or the use of its services or facilities on the basis of age, sex, race, religion, color, ancestry, or national origin." (Rev. & Tax. Code, §§ 17269, subd. (a) [personal income tax]; 24343.2, subd. (a) [corporate tax].) These statutes also require any private club that maintains such a

discriminatory policy, and that holds an alcoholic beverage license, to include on any receipt furnished to a taxpayer a statement informing the taxpayer that "[t]he expenditures covered by this receipt are nondeductible for state income tax purposes or franchise tax purposes." (Rev. & Tax. Code, § 17269, subd. (b), & § 24343.2, subd. (b); see also Bus. & Prof. Code, § 23438, subd. (a).)

Furthermore, the Legislature also has adopted a variety of other statutes that, while authorizing certain categories of private clubs to obtain liquor licenses, withhold such licenses from specified clubs that restrict membership on the basis of designated categories, such as race, religion, national origin, or gender. (See Bus. & Prof. Code, §§ 23426.5 [tennis club], 23428.5 [press club], 23428.18 [labor council], 23428.19 [handball or racquetball club], 23428.20, subd. (d) [condominium homeowners association], 23428.21 [local dental society], 23428.22 [club promoting cultural ties between United States and foreign country], 23428.23 [letter carriers local], 23428.24 [nonprofit social organization with more than 350 members], 23428.25 [Hidalgo Society], 23428.26 [nonprofit property owners association having at least 2,500 members], 23428.27 [peace officers and employees association].) Although California has not adopted a general antidiscrimination statute applicable to all private clubs that hold liquor licenses,[3] the numerous, individual club-license statutes that have been enacted demonstrate that the general topic of discrimination in private club membership has been a repeated and familiar item on the legislative agenda.

As reflected in these recent legislative enactments, both in California and in other states, there are a variety of ways to address the serious public policy questions presented when private clubs choose to restrict their membership in a discriminatory fashion. Although one possible remedy is legislative action to bring a designated category of private clubs within the reach of a state's public accommodation statute, other means exist to deal with this issue. The choice among alternative remedies—or the decision as to what combination of remedies should be invoked—is, by its nature, a legislative determination, not a judicial one. Thus, because the current provisions of section 51 were not intended to apply to the membership decisions of a private country club such as defendant, any expansion of the scope of this

---

[3] In 1993, a bill was introduced that would have prohibited the issuance or renewal of a club liquor license to any club that denies membership on the basis of "color, race, religion, ancestry, national origin, sex, disability, or age," and that has (1) a membership of 400 or more, (2) provides regular meal service, and (3) regularly accepts payment from or on behalf of nonmembers for expenses incurred at the club in furtherance of trade or business. (Assem. Bill No. 159 (1993-1994 Reg. Sess.).) Although the measure passed both houses of the Legislature, it was vetoed by the Governor, and the Legislature did not override the veto.

statute to reach such membership decisions must be made by the Legislature, and not by this court.

## V.

### CONCLUSION

For the reasons discussed above, I would affirm the judgment of the Court of Appeal.

Respondents' petition for a rehearing was denied September 21, 1995.