BRUNSMAN, Appellant,

v.

WESTERN HILLS COUNTRY CLUB et al., Appellees.

[Cite as *Brunsman v. W. Hills Country Club*, 151 Ohio App.3d 718, 2003-Ohio-891.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–020323.

Decided Feb. 28, 2003.

720

Geoffrey W. Pittman Co., L.P.A., and Geoffrey W. Pittman, for appellant.

Kohnen & Patton, L.L.P., K. Roger Schoeni and Timothy E. Rogus, for appellees.

GORMAN, Judge.

{¶ 1}  Plaintiff-appellant Richard T. Brunsman Jr. appeals from the trial court's order granting summary judgment in favor of the defendants-appellees, Western Hills Country Club and Erlene Ellis, its office manager, on his complaint seeking compensatory and punitive damages because of his exclusion from membership in the country club.  The undisputed evidence before the trial court demonstrated that the country club and Ellis were entitled to judgment as a matter of law on Brunsman's claims for breach of contract, intentional infliction of emotional distress, and defamation.  We affirm.

{¶ 2}  The country club's by-laws specified the protocol for membership. Upon receiving an application for membership, endorsed by two members with a check for the initiation fee, the membership committee would investigate the candidate and forward its recommendation to the board of directors, which would vote to invite or reject the proposed candidate.  Section 8, Article II of the country club's by-laws provided that two "no" votes (blackballs) by the board would deny membership to a candidate.  The candidate would be notified and the check would be returned if he or she was rejected for membership.

{¶ 3}  The country club's membership committee approved Brunsman's application for membership and forwarded it to the board.  Because it wanted clarification of certain information in his application, at its July 11, 2000 meeting the board elected to return the application to Brunsman.  After he resubmitted his application, the board rejected Brunsman for membership at its meeting of August 15, 2000, noting in the minutes that his application had been withdrawn. One member stated, "By the time it got to me, there were no blackballs left in the box."  The board sent a letter, dated August 16, 2000, to Brunsman, stating that "the Board has chosen not to accept your application for membership. Enclosed is your check.  * * * Please feel free to apply at a later date."

{¶ 4}  When Brunsman received notice of his rejection, he wrote a letter to the country club president, Robert Diers, expressing his dissatisfaction with the board's decision.  He further invited Diers to select someone from the country club to appear with him on a local radio call-in show, hosted by two of his friends, to discuss "what I have been put through, the fact that Western Hills seems to take an elitist attitude, and why there are not more minority members."  Under Brunsman's direction, employees of his computer business also created two websites ("westernhillscountryclub.org" and "westernhillscountryclub.com") purportedly for individuals rejected by the country club.  On both sites was the motto "We wear it as a badge of Honor."

{¶ 5}  After Brunsman's rejection, he stated that he had a telephone conversation with William J. Sachs, the membership chairman who, he said, told him to

reapply. His father also confronted the club's president, Diers, complaining that his son's rejection was embarrassing and devastating for the family. Brunsman's father, his brother, and his sister were members of the country club. Diers suggested to Brunsman's father that his son might have a better chance for membership if he reapplied after the board changed, as two members who opposed him would be leaving.

{¶ 6}  On January 22, 2001, Brunsman submitted another application for membership. His father consulted Sachs, formerly the membership chairman and the current country club president, on how his son could improve his chances for membership. Sachs suggested that it might be helpful if Brunsman were to wear a blazer to the interview, write a letter of apology to Ellis, and treat the club employees with respect.

{¶ 7}  Following a tie vote, the membership committee referred Brunsman's second application to the board. Brunsman stated that, at some point in time, it was suggested that he withdraw his application, but his response was, "If you vote me down, you vote me down." The board interviewed Brunsman at its February 21, 2001 meeting. Afterwards four board members cast blackballs. The board again notified Brunsman that he had been rejected for membership in the country club. Brunsman then brought these lawsuits consolidated by the trial court.

{¶ 8}  Claiming that there were no genuine issues of material fact remaining, Brunsman and the country club and Ellis all moved for summary judgment. The trial court granted the motions of the country club and Ellis and entered judgment in their favor. It overruled Brunsman's cross-motion for summary judgment. The trial court also ordered Brunsman to pay the country club and Ellis $1,336.50 in sanctions and attorney fees for discovery violations. He has not appealed the trial court's order awarding sanctions.

{¶ 9}  Because summary judgment presents only questions of law, an appellate court reviews the record de novo. See *Polen v. Baker* (2001), 92 Ohio St.3d 563, 564–565, 752 N.E.2d 258. Under Civ.R. 56(C), summary judgment is proper when no genuine issue of material fact remains to be litigated and the moving party is entitled to judgment as a matter of law. Where the parties moving for summary judgment discharge their initial burden of identifying the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claims, the nonmoving party has the reciprocal burden of producing evidence on the issues for which it bears the burden of production at trial. See Civ.R. 56(C); *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264.

{¶ 10}  We note that the rights of association and privacy under the First and Fourteenth Amendments to the United States Constitution confer on a

voluntary social club the right to select its members. See *Warfield v. Peninsula Golf & Country Club* (1995), 10 Cal.4th 594, 42 Cal.Rptr.2d 50, 896 P.2d 776; see, also, *Hartung v. Audubon Country Club, Inc.* (Ky.App.1990), 785 S.W.2d 501. However, if the club is not private, but is determined to be a public accommodation, it is subject to state civil rights laws prohibiting discrimination. See *Warfield v. Peninsula Golf & Country Club;* see, also, Annotation, What Constitutes Private Club or Association Not Otherwise Open to Public that is Exempt from State Civil Rights Statute (2000), 83 A.L.R.5th 467.

{¶ 11} Brunsman does not challenge his exclusion from membership in the country club on grounds that his civil rights were violated. Instead, he alleges that the trial court erred in entering summary judgment on his breach-of-contract claim. Accordingly, Brunsman had the burden of production in the trial court on each element, including the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. See, e.g., *Doner v. Snapp* (1994), 98 Ohio App.3d 597, 649 N.E.2d 42; see, also, *Metro. Life Ins. Co. v. Triskett Illinois, Inc.* (1994), 97 Ohio App.3d 228, 646 N.E.2d 528.

{¶ 12} Relying upon the statement in the minutes of the board's August 15, 2000 meeting that his invitation was "withdrawn," Brunsman assumes that he could have only been a member for his invitation to have been withdrawn by the board. He argues that the membership committee's recommendation to the board made his acceptance only a formality by the board. It is Brunsman's position that because he was already a member on February 21, 2001, as evidenced by the word "withdrawn" in the minutes of August 15, 2000, his removal could have only been by the procedure for expulsion in the by-laws.

{¶ 13} Brunsman's argument ignores the requirement in the country club's by-laws that the board vote on a candidate for membership. His argument is, likewise, a contradiction of paragraph twelve of his first amended complaint, in which he stated that "[h]is initial application was rejected." The undisputed testimony of the board members and the board's rejection letter of August 16, 2000, to Brunsman were irrefutable evidence that his first application for membership was rejected by a vote of the board. Even his father believed that Brunsman had been twice rejected by the board for membership in the country club. Brunsman's own testimony, based on supposition, second- or third-hand hearsay and rumor, was that he did not consider himself a member on February 21, 2001. He described a telephone call from a club member who, Brunsman said, advised him that a straw vote had been taken and asked whether he would like to withdraw his application, and "they would treat it as if he had never submitted one." He said he later tried to get a tee time, but was refused because he was not a member.

{¶ 14} Brunsman also argues that the country club entered into a contract with him when Sachs, as the president of the board, promised him membership if he would do what Sachs suggested to his father. The apparent power of an agent is determined from the acts of the principal and not by the acts of the agent. See *Master Consol. Corp. v. BancOhio Natl. Bank* (1991), 61 Ohio St.3d 570, 575 N.E.2d 817, syllabus. The record demonstrates that all parties understood that Sachs did not have authority under the by-laws to unilaterally offer Brunsman membership. His father's deposition refuted the existence of a contract. When asked whether Sachs promised that he would get his son a membership in the country club, Busman's father replied, "I don't know if he promised me or not. You know, I think he laid out a path to get that done. He was trying to help." Sachs possessed no apparent authority to approve membership. See *Williams v. ITT Fin. Serv.* (Jun. 25, 1997), 1st Dist. No. C–960234, 1997 WL 346137.

{¶ 15} While Brunsman alleged in his first amended complaint that the country club did not return his $5,000 check for his initiation fee, he conceded that the check has never been cashed. He stated that he did not receive the country club's letter of March 24, 2001, returning his check even though it was mailed to his correct address.

{¶ 16} Because Brunsman failed to make a showing sufficient to establish that a contract for membership existed with the country club—an essential element of his claim—summary judgment was properly entered on that claim. See *Doner v. Snapp* (1994), 98 Ohio App.3d 597, 600–601, 649 N.E.2d 42. Those portions of the first and second assignments of error addressing the breach-of-contract claim are overruled.

{¶ 17} In the second part of his second assignment of error, Brunsman contends that the trial court erred in entering summary judgment on the second count of his first amended complaint, because his rejection by the country club caused him to suffer anxiety, loss of sleep, weight gain, high stress levels, and physical illness. To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show the following: "(1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress." *Phung v. Waste Mgt., Inc.* (1994), 71 Ohio St.3d 408, 410, 644 N.E.2d 286.

{¶ 18} To avoid summary judgment, Brunsman had to show in the trial court that the country club's conduct was so outrageous that it went beyond all possible bounds of decency and was so atrocious that it was "utterly intolerable in a civilized community." *Yeager v. Local Union 20* (1983), 6 Ohio St.3d

369, 375, 6 OBR 421, 453 N.E.2d 666. Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are insufficient to sustain a claim for relief. Id. Assuming for the sake of argument that Brunsman had established that a contract existed, absent personal injury to a plaintiff, damages for emotional distress are not available unless the contract or breach is of a kind that "serious emotional disturbance" is particularly likely to result. *Kishmarton v. William Bailey Constr., Inc.* (2001), 93 Ohio St.3d 226, 754 N.E.2d 785, paragraph two of the syllabus, approving 3 Restatement of the Law 2d, Contracts (1981) 149, Section 353.

{¶ 19} In *Uebelacker v. Cincom Sys., Inc.* (1988), 48 Ohio App.3d 268, 276, 549 N.E.2d 1210, we held that while medical testimony is not indispensable to the claim of intentional infliction of serious emotional distress, there must be some "guarantee of genuineness" of the emotional injury sufficient to support its severity and cause. See *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 76, 451 N.E.2d 759; see, also, *Powell v. Grant Med. Ctr.* (2002), 148 Ohio App.3d 1, 6–7, 771 N.E.2d 874.

{¶ 20} Brunsman's claim of intentional infliction of emotional distress exudes an aura of surrealism. The extent of his evidence of serious emotional distress was his statement that he talked, casually and in a social setting, to two chiropractors who said that he was experiencing anxiety and stress. His argument that the board, by denying him membership, as it was entitled to do under the country club's by-laws, had committed extreme and outrageous acts because he heard that the board had hired someone to investigate him, is specious. He stated that he was not embarrassed to discuss his rejection with friends and described any embarrassment as "more of a family than personal" situation. He more than adequately described any legal implications by conceding that his exclusion from membership was "no big deal."

{¶ 21} Brunsman failed to make a showing sufficient to establish that the board's conduct was extreme and outrageous and that he suffered serious emotional distress—essential elements of his intentional-infliction-of-emotional-distress claim. Summary judgment was properly entered on that claim. See *Phung v. Waste Mgt., Inc.*, 71 Ohio St.3d at 410, 644 N.E.2d 286. The remaining portion of the second assignment of error is overruled.

{¶ 22} In his final assignment of error, Brunsman contends that the trial court erroneously granted summary judgment in favor of Ellis. Brunsman's defamation claim against Ellis lacks both a legal basis and substantive content. A defamatory statement is the unprivileged publication of false and defamatory matter that tends to reflect injuriously on a person's reputation, or exposes a person to "public hatred, contempt, ridicule, shame or disgrace, or affecting a

person adversely in his or her trade, business or profession." *Hauck v. Gannett Corp.* (Mar. 20, 1998), 1st Dist. No. C–970171, 1998 WL 131589, quoting *A & B–Abell Elevator v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 7, 651 N.E.2d 1283. Slander involves oral defamatory statements. See *McCartney v. Oblates of St. Francis deSales* (1992), 80 Ohio App.3d 345, 353, 609 N.E.2d 216.

{¶ 23}   When alleged defamatory statements have occurred in a business context by someone whose job gives that person a legitimate interest in the matter, they are subject to a qualified privilege when the circumstances exist or are reasonably believed by the defendant to exist. See *Rolsen v. Lazarus, Inc.* (Sept. 29, 2000), 1st Dist. Nos. C–990588 and C–990627, 2000 WL 1434170. In *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 245–246, 72 O.O.2d 134, 331 N.E.2d 713, the Supreme Court stated, "A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable, and although the duty is not a legal one, but only a moral or social duty of imperfect obligation."

{¶ 24}   To defeat the privilege, it is incumbent upon the plaintiff to prove that the published statements were untrue and made with actual malice. See id. Proof of actual malice requires clear and convincing evidence that the defendant, acting out of spite or ill will, made the statements either with knowledge that they were false or with reckless disregard for their truth. See *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 573 N.E.2d 609, paragraph two of the syllabus.

{¶ 25}   Brunsman's claim against Ellis involved statements that she had made to Diers and to the board at its meeting of August 15, 2000. Her comments resulted from a call to Ellis by Brunsman inquiring about the status of his July 11, 2000 application. Ellis responded to Brunsman that she did not know what the board had decided at its meeting the night before. When he asked for Diers's telephone number at work, she informed him that she was not permitted to give him that information but would give Diers a message when he arrived at the club. In a conversation with Diers, she described Brunsman's tone as a "little loud" and a "little demanding." At the August 15, 2000 board meeting, Ellis was present to take the minutes. Diers asked her to tell the board about her conversation with Brunsman that she had previously related to him. She informed the board that she was uncomfortable with Brunsman's tone and that he had raised his voice, had talked down to her, and had been demanding.

{¶ 26}  Brunsman denied that he had such a conversation with Ellis.  He said that he had a conversation with Ellis concerning a second application form after his first rejection by the board and that Ellis refused to send it to him.  He said that she told him that he could not reapply and would have to talk to Diers.  When questioned in his deposition about whether he was rude to Ellis, he said, "I don't hear well in this ear.  And I tend to speak louder than most people.  And I think that comes across as forceful * * *."  Ellis testified that Brunsman called her again after the meeting of August 15, 2000, to inquire about the status of his application.  She described him as belligerent and angry and said that he told her he was "being jerked around" because she would not tell him whether his application had been approved.

{¶ 27}  Even construing Ellis's remarks in a manner most strongly in favor of Brunsman, they did not constitute slander, as they met none of the elements of defamatory statements.  See *Hauck v. Gannett Corp.;* see, also, *Dresher v. Burt,* 75 Ohio St.3d at 293, 662 N.E.2d 264.

{¶ 28}  Ironically, Brunsman concedes that he has no idea what Ellis actually said.  In his brief, he states that Ellis defamed him because one of the board members, Thomas Michael Fischer, testified that she had called Brunsman "unprofessional," which was heard by a member of the board who was one of his customers.  The record, however, shows that Fischer testified, "According to the employee, it wasn't handled very professionally on his part * * * the phone call wasn't very professional on his part."  The statement, therefore, was not Ellis's characterization of Brunsman, the person, but of his attitude during the telephone conversations.

{¶ 29}  Ellis's statements to Diers and to the board that Brunsman alleges were slanderous were indisputably subject to a qualified immunity.  In her capacity as the country club's office manager, Ellis was asked by Diers and the board to relate her conversations with Brunsman.  The significance of Brunsman's conversation with Ellis in the country club's business office was summed up by Fischer, who said, "If a person talks to an employee before he's a member like that, how's he going to talk to an employee after he's a member." The third assignment of error is overruled.

{¶ 30}  Therefore, we affirm the judgment of the trial court.

Judgment affirmed.

HILDEBRANDT, P.J., and WINKLER, J., concur.